# EXHIBIT 2

# In The Matter Of:

*Alan Thibault v.*
*Edward Wierszewski*

---

*Marty Bugbee*
*February 23, 2016*

---

*Carroll Court Reporting and Video*
*175 Cass Avenue*
*Mt. Clemens, MI  48043*



Original File MBugbee 2-23-16.txt
Min-U-Script® with Word Index

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

Page 1

```
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MICHIGAN
 2                     SOUTHERN DIVISION

 3   ALAN THIBAULT,

 4                        Plaintiff,

 5   vs.                      Case No. 2:15-cv-11358

 6   EDWARD WIERSZEWSKI, individually
     and in his official capacity as a
 7   Public Safety Officer,

 8                        Defendant.

 9   _____/

10        DEPONENT: MARTY BUGBEE
          DATE:     Tuesday, February 23, 2016
11        TIME:     10:45 a.m.
          LOCATION: 26700 Lahser Road
12                  Southfield, MI
          REPORTER: Nikki Hatz, CSR-2377
13
     APPEARANCES:
14
          MR. SOLOMON RADNER
15        1-800-Law-Firm
          26700 Lahser Road   Suite 400
16        Southfield, MI  48033
          248-291-9712
17
                    Appearing on behalf of Plaintiff.
18
          MR. GEORGE M. DEGROOD
19        Thomas Degrood and Witenoff
          400 Galleria Officentre  Suite 550
20        Southfield, MI  48034
          248-353-4450
21
                    Appearing on behalf of Defendant.
22

23

24

25
```

Page 2

```
 1
 2                  I N D E X
 3   WITNESS:                              PAGE
 4   MARTY BUGBEE
 5   Examination by Mr. Degrood               3
 6   Examination by Mr. Radner               85
 7
 8
 9                E X H I B I T S
10   NUMBER          IDENTIFICATION        PAGE
11   Exhibit No. 1   Curriculum Vitae         4
12   Exhibit No. 2   Photocopy of CD          8
13   Exhibit No. 3   Training Course Reference 19
14   Exhibit No. 4   Deposit Slip            20
15   Exhibit No. 5   National Weather Service Temps  27
16   Exhibit No. 6   Handwritten Notes/NHTSA review 28
                     9 pages
17   Exhibit No. 7   Handwritten Notes/Videotape  31
                     Review/30 pages
18   Exhibit No. 8   17 Page Police Report   45
19   Exhibit No. 9   Training Certificates   76
20
21   *attached.
22
23
24
25
```

BUGBEE

Page 3

```
 1                    Southfield, MI
 2               Tuesday, February 23, 2016
 3
 4                    *   *   *
 5
 6        M A R T Y   B U G B E E,
 7   after having been first duly sworn to tell the
 8   truth, the whole truth and nothing but the truth,
 9   was examined and testified as follows:
10                    EXAMINATION
11   BY MR. DEGROOD:
12        Q.  Good morning.  Would you state your full
13   legal name for the record?
14        A.  My name is Marty George Bugbee.  Spelling:
15   M-a-r-t-y.  G-e-o-r-g-e.  B-u-g-b-e-e.
16        Q.  Mr. Bugbee, my name is George DeGrood.  I
17   represent the defendants in this lawsuit that was
18   commenced against them on behalf of Mr. Alan Thibault.
19             MR. DEGROOD: The deposition is being
20        taken pursuant to Notice and pursuant to the
21        Michigan, the actual Federal Rules of Evidence and
22        the Federal Rules of Civil Procedure.
23        Q.  Could you please give me your residential
24   address.
25        A.  1380 Larkmoor Boulevard.  L-a-r-k-m-o-o-r.
```

BUGBEE

Page 4

```
 1   Boulevard.  Berkley, Michigan 48073.
 2             (Deposition Exhibit No. 1 marked for
 3             identification.)
 4        Q.  Mr. Bugbee, I'm going to hand to you what has
 5   been marked as Deposition Exhibit No. 1.  For the record
 6   could you please identify what this is.
 7        A.  This is my curriculum vitae.
 8        Q.  Would you agree it's two pages long?
 9        A.  Yes.
10        Q.  There's nothing in your C.V. that has any
11   type of fee schedule with respect to any of the efforts
12   that you might provide to individuals who hire you for
13   your services.  True?
14        A.  Yes, sir.  That is true.
15        Q.  Yesterday on February 22nd, 2016, you
16   forwarded to my office a request that indicated that I
17   would need to have a check in the amount of $700 for a
18   minimum of a four hour appearance fee for your deposition
19   today.  Correct?
20        A.  Correct.
21        Q.  Have I so far given you the 700 check?
22        A.  Yes, you have, sir.
23        Q.  Your hourly fee is identified as $175 per
24   hour.  My question to you is:  Is that the fee, 175 per
25   hour, that you charge for review as well as for
```

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                          Page 5

1  testifying in court?
2      A.   Yes.
3      Q.   Should it be necessary for you to proceed to
4  court, do you also do a four hour minimum or do you go by
5  straight hourly rate?
6      A.   It would be by straight hourly rate.
7      Q.   It appears to me in my review of Exhibit 1
8  that for the majority of your adult life you were
9  employed by the State of Michigan as a Michigan State
10  Police Trooper?
11     A.   That is correct.
12     Q.   That began in April of 1989?
13     A.   Yes, sir.
14     Q.   And you retired from the Michigan State
15  Police in April of 2011?
16     A.   That's correct.
17     Q.   What was your rank at the time of your
18  retirement from the Michigan State Police?
19     A.   I was a Detective First Lieutenant.
20     Q.   At what location or post were you working
21  when you last worked for the State Police?
22     A.   I was the Commander of the Information
23  Sharing Environment Section and that was located at the
24  Hidta: H-i-d-t-a, Hidta Office in downtown Detroit.
25     Q.   Is that in the New Center area?

BUGBEE                                          Page 6

1      A.   Yes, sir.  That's near Grand Circus Park,
2  right near the Tiger Stadium, Comerica Park.
3      Q.   Now it indicates -- strike that.
4           Have you ever been certified as a
5  standard sobriety field test expert:  Yes or no?
6      A.   Yes.
7      Q.   When were you so certified as an instructor
8  for standard field sobriety testing?
9      A.   You say expert or instructor?
10     Q.   As an instructor.
11     A.   I was a Field Training Officer with the
12  Michigan State Police, as well as with other the police
13  department prior to Michigan State Police.  And in that
14  capacity I instructed other officers and troopers on
15  field sobriety testing and the arrest process for alcohol
16  enforcement.
17     Q.   The prior law enforcement agency that you
18  worked with before joining the State Police was what
19  agency?
20     A.   I was a police officer with Chesterfield
21  Township Police Department.  I graduated from the Macomb
22  Police Academy in 1985.  I worked there on a part time
23  for several months.  Then I went to the Plymouth Township
24  Police Department, where I worked from '85 to '89.  There
25  I served as a Field Training Officer.

BUGBEE                                          Page 7

1      Q.   Now as I understand a Field Training
2  Officer's role, as it existed when you were at both the
3  Plymouth Township and Michigan State Police, that was
4  pretty much hands on experience with respect to -- I'll
5  use the term rookie or a new hire in the agency.
6  Correct?
7      A.   That's correct.
8      Q.   So they would in essence ride along with you
9  if you were doing road patrol and looking for possible
10  individuals who were violating traffic laws?
11     A.   Yes.
12     Q.   And you would perhaps point out to them a
13  situation and perhaps quiz them, etcetera, to make sure
14  that they fully understood the law and were capable of
15  applying same to given circumstances?
16     A.   No.  It's a little more complex than that.
17     Q.   Well, did you ever sit down with your Field
18  Training Officers with respect to teaching any field
19  sobriety testing with any course textbook or anything of
20  that nature?  Yes or no.
21     A.   Yes.
22     Q.   What textbook would you have used?
23     A.   It would have been the Field Training Manual.
24     Q.   For the State Police?
25     A.   No.  For the Plymouth Township Police

BUGBEE                                          Page 8

1  Department and then also the Michigan State Police.
2      Q.   Now I see a fair amount of materials in front
3  of you and did you bring materials in response to the
4  Notice to Produce that was attached?
5      A.   Yes, I did.
6      Q.   What did you bring with you; what materials?
7      A.   Well, I brought a disk that I burned for you
8  that contains the National Highway Transportation Safety
9  Administration manuals for three different levels of
10  alcohol enforcement.  One being the DUI or DWI Detection
11  Manual for Standard Field Sobriety Testing.  The other
12  manual being the Advanced Alcohol Enforcement Manual and
13  the third manual that is on here is the Drug Recognition
14  Expert Manual.
15     Q.   All right.
16     A.   Also other resources.  Just some
17  correspondences and some --
18     Q.   Let me just stick with the first one here.
19          MR. DEGROOD: We'll mark this as
20     Exhibit 2, please.
21          (Deposition Exhibit No. 2 marked for
22          identification.)
23     Q.   Mr. Bugbee, with respect to Exhibit No. 2, do
24  you have an index somewhere as to what is on here or were
25  you testifying from memory?

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                          Page 9

1    A.   Testifying from memory.
2    Q.   With respect to the first manual that you
3  identified, what was that again?
4    A.   That was the DWI Detection Manual.  That's
5  just my memory of what the title was.  It's not specific.
6    Q.   What edition was that?
7    A.   Don't know.
8    Q.   What was the second manual?
9    A.   That was the -- I would like to look at my --
10   Q.   Go ahead.  You can pull out your notes,
11 whatever.
12          MR. RADNER: If you like, I can turn
13     my laptop on and we can all look together at it.
14     That's why I brought my laptop.
15          MR. DEGROOD: That's okay.  I can't
16     read electrons.
17   A.   The second manual is the Advanced Roadside
18 Impaired Driving Enforcement Manual.
19   Q.   What edition was that?
20   A.   R5 slash 13 edition.
21   Q.   What was the third manual on that?
22   A.   The third manual is the training manual.
23 It's a NHTSA manual, NHTSA being:  National Highway
24 Transportation Safety Administration Manual, training
25 manual for DRE.

BUGBEE                                         Page 10

1    Q.   What edition was that?
2    A.   Don't know off the top of my head.
3    Q.   Were any of these manuals the manuals that
4  you procured from Michigan State Police Sergeant Perry
5  Curtis within the past two or three weeks?
6    A.   Perry Curtis.  I didn't speak to a Perry
7  Curtis.
8    Q.   Did you procure any of those manuals from the
9  Michigan State Police within the last two or three weeks?
10   A.   I procured the Standard Field Sobriety Test
11 Manual, the first one.
12   Q.   When did you procure that?
13   A.   It would have been within the last two weeks.
14   Q.   From where did you procure it?
15   A.   Directly from Detective or -- excuse me.
16 From First Lieutenant James Flegal.
17   Q.   James and his last name?
18   A.   James Flegal:  F-l-e-g-a-l.  He's the Section
19 Commander for Traffic Services Division.
20   Q.   Before procuring that manual from Sergeant
21 Flegal when is the last time that you had reviewed that
22 manual from today going backwards?
23   A.   I don't recall.
24   Q.   Would it have been when you were still
25 employed as a Michigan State Police Officer?

BUGBEE                                         Page 11

1    A.   Possibly.
2    Q.   What about the other two manuals, the NHTSA
3  manual, when did you last review that?
4    A.   I don't recall when that was either.
5    Q.   More likely than not when you were still
6  engaged as an officer with the Michigan State Police?
7    A.   Possibly.
8    Q.   What about with the DWI Detection Manual,
9  same question.  When did you last utilize that?
10   A.   I don't recall that either.
11   Q.   Probably when you were still working at the
12 State Police?
13   A.   Possibly.
14   Q.   Would I be correct that at no time since
15 retiring from the Michigan State Police in April of 2011,
16 were you involved in any type of traffic stops of
17 citizens on the roadway suspected of either erratic
18 driving or operating under the influence?
19   A.   That's correct.
20   Q.   So with respect to the date of December 5th,
21 2014, you were not actively engaged in any type of
22 traffic stops for any law enforcement agencies.  Correct?
23   A.   That's correct.
24   Q.   Would I also be correct that in December of
25 2014, you were no longer engaged in field training

BUGBEE                                         Page 12

1  exercises as a field training officer?
2    A.   That's correct.
3    Q.   Would your activities as a field training
4  officer have ceased when you retired in April of 2011,
5  from the Michigan State Police?
6    A.   That's correct.
7    Q.   Would I be correct that at no time have you
8  ever participated in a lecture as part of instruction in
9  field sobriety tests?
10   A.   Participated in as in?
11   Q.   As a lecturer to a group of individuals who
12 were undergoing training?
13   A.   No.  I have not done that.
14   Q.   Now you indicated that you also had the DRE
15 Manual?
16   A.   Correct.
17   Q.   When did you first receive a copy of a DRE
18 Manual?
19   A.   I don't recall when I first looked at one.
20   Q.   Was it in connection with your review of this
21 case?
22   A.   That was the last time I looked at it.  I
23 don't recall prior to that when I looked at one.
24   Q.   Is it possible that the first time that you
25 saw a DRE Manual was as a result of your participation in

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                        Page 13

1  this lawsuit?
2      A.   No.  I believe I have reviewed one in the
3  past.
4      Q.   Am I correct that you are not a -- when you
5  use the term DRE, what are you referring to?
6      A.   Drug Recognition Expert.
7      Q.   Have you ever taught the DRE curriculum?
8      A.   No, I have not.
9      Q.   Have you ever been certified to teach the DRE
10 curriculum?
11     A.   No, I have not.
12     Q.   Have you ever participated as a student in
13 the DRE curriculum?
14     A.   No, I have not.
15     Q.   So you have never been trained and do not
16 hold yourself out as a drug recognition expert.  Correct?
17     A.   Correct.
18     Q.   Now as a result of your involvement in this
19 lawsuit -- and by the way, when were you first contacted
20 to consider becoming engaged in this matter?
21     A.   It would have been I think three weeks ago.
22     Q.   Since being retained approximately three
23 weeks ago in this matter, have you kept a log of the
24 amount of time that you have spent in your endeavors?
25     A.   No, I haven't.

BUGBEE                                        Page 14

1      Q.   When you were first contacted, by whom were
2  you first contacted approximately three weeks ago?
3      A.   I was contacted by Solomon Radner.
4      Q.   Had you ever provided any review services for
5  purposes of rendering any type of opinions for Mr. Radner
6  in any cases prior to your involvement in this one?
7      A.   No, I have not.
8      Q.   How about with respect to Mr. Radner's law
9  firm, 1-800-Law-Firm, have you ever been retained by the
10 firm to participate in providing review and/or opinions
11 with respect to any type of police work besides this
12 case?
13     A.   No, I have not.
14     Q.   Do you in some fashion advertise your
15 availability to provide opinions concerning police
16 activities?
17     A.   No.
18     Q.   Do you have any idea how Mr. Radner
19 discovered your availability?
20     A.   I believe it was through word of mouth.
21     Q.   Word of mouth regarding who?
22     A.   I don't know who he spoke to but he contacted
23 me and said he had talked to somebody who said to talk to
24 me.
25          MR. RADNER: I forgot that guy's name

BUGBEE                                        Page 15

1  too or I would tell you.
2          MR. DEGROOD: That guy's name you
3  mean?
4          MR. RADNER: Yes.
5          MR. DEGROOD: It was a gal actually
6  and you forgot that conveniently.
7          MR. RADNER: It was a girl you said?
8      Q.   Would I be correct that nowhere in Exhibit 1
9  do you indicate that you hold yourself out as an expert
10 in standard field sobriety testing?
11     A.   That's correct.
12     Q.   As you use the term standard field sobriety
13 testing, what does that mean to you?
14     A.   Well, that means you're trained in the
15 capability to detect driving behaviors that could
16 indicate intoxication.  Trained in collecting
17 observations of drivers from direct contact.  Conducting
18 standardized testing to determine probable cause to make
19 arrests for driving under the influence of alcohol or
20 drugs.
21     Q.   With respect to the three manuals that you
22 have reproduced on Exhibit No. 2, can you tell me with
23 respect to any of those manuals which if any sections of
24 those manuals were reviewed by you in formulating any
25 opinions you might be rendering here today?

BUGBEE                                        Page 16

1      A.   I reviewed each manual and every page over
2  the weekend.
3      Q.   Do you have any recollection how long that
4  took to review every page of those three manuals?
5      A.   Most of the weekend.  I didn't log the time.
6      Q.   How are you being paid for your services by
7  Mr. Radner; by the hour?
8      A.   Flat fee.
9      Q.   A flat fee?
10     A.   Yes.
11     Q.   What is that flat fee?
12     A.   I provided a deposit slip indicating that in
13 my discovery to you.  It's $2,000.
14     Q.   All right.  So no matter if it takes one hour
15 or 60 hours it's a flat fee of $2,000 for Mr. Radner.
16 Correct?
17     A.   Correct.
18     Q.   Would that be the basis upon which you have
19 failed to complete a log as to the time that you have
20 invested in this matter?
21     A.   Tracking time didn't matter.  No.
22     Q.   So you're not keeping track of time at all.
23 It doesn't matter?
24     A.   No.
25     Q.   How do you ever determine whether or not you

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

1  have made money, broke even or lost money with respect to
2  the time and efforts put into your review process?
3      A.  I don't.
4      Q.  Have you testified in open court with respect
5  to opinions of constitutional violations by police
6  officers?
7      A.  No.
8      Q.  Have you testified in open court as an expert
9  witness?
10     A.  As a police officer, yes.
11     Q.  When you were still employed by Michigan
12 State Police?
13     A.  Right.  Right.
14     Q.  Since retiring from the Michigan State
15 Police, have you testified in open court as an individual
16 rendering opinions critical of police officers?
17     A.  No, I have not.
18     Q.  Have you at any time testified in open court
19 as an individual offering opinions substantiating the
20 activities of police officers who are being sued for
21 alleged wrongdoings?
22     A.  No, I have not.
23     Q.  So just so I'm clear.  At no time since your
24 retirement from Michigan State Police have you testified
25 in any court in the State of Michigan, state court or

1  federal court?
2      A.  Correct.
3      Q.  Have you testified in any other states?
4      A.  No.
5          MR. RADNER:  Just so we're clear.
6  I'm just going to make a little objection here that
7  you kind of went back from or you switched from
8  asking him only if he has been qualified as an
9  expert and asked questions for his opinions.
10         Then you kind of wrapped that up with
11 a question of:  You have never testified in any
12 state or federal court.  I think that when he was
13 answering, he was answering as to the being
14 qualified as an expert for his opinions.
15         MR. DEGROOD:  Pardon me?  What's your
16 objection?
17         MR. RADNER:  I stated it already.
18         MR. DEGROOD:  Sounded like a treatise
19 to me but that's okay.
20     Q.  What is the next item that you have brought
21 with you?
22     A.  Well, it was a description of the drug or the
23 training sequence for -- it was just a reference that I
24 looked at while I was reviewing things.
25     Q.  May I see that?

1      A.  It's for the training courses that are
2  offered by Michigan State Police in regard to alcohol
3  enforcement, the different stages of training.  It was
4  just a reference that I had reviewed pursuant to your
5  Discovery Order.  I produced that as well because I had
6  read it through the weekend.
7      Q.  Let's mark that Exhibit No. 3.  Before you
8  mark Exhibit No. 3.
9          To your independent knowledge and
10 recollection at the time of your retirement from the
11 Michigan State Police, was there a drug recognition expert
12 program available to officers in Michigan?
13     A.  I don't recall.  I don't.
14         MR. RADNER:  What was Exhibit 3?
15     Q.  You don't recall or you don't know?
16     A.  I don't know if there was or not.  I don't
17 recall if I knew that at the time.
18     Q.  Okay.
19         MR. DEGROOD:  We'll now mark this as
20 Exhibit 3.
21         (Deposition Exhibit No. 3 marked for
22         identification.)
23     Q.  What is the next item that you brought with
24 you?
25     A.  The next item is what I had mentioned

1  earlier.  This is the deposit slip from the fee that I
2  received from Mr. Radner in regard to this case.  I
3  received it on 1-26, 2016.  I produced that in response
4  to your Court Order.
5      Q.  All right.  Let's mark that as our next
6  Exhibit.
7          (Deposition Exhibit No. 4 marked for
8          identification.)
9      Q.  When Mr. Radner first contacted you did he
10 meet with you or was it a telephone contact?
11     A.  Telephone contact.
12     Q.  What did you discuss with him during your
13 initial contact and when in proximity to the date of
14 1-26-16 of Exhibit 4 did that conversation first take
15 place?
16     A.  I think it was a day or two prior to that
17 1-26.
18     Q.  Do you remember how long the initial phone
19 call lasted?
20     A.  No, I don't.
21     Q.  Did you take notes of any of the information
22 that was imparted to you by Mr. Radner?
23     A.  No, I didn't.
24     Q.  Do you recall what it was that you discussed
25 with Mr. Radner at that time?

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                          Page 21

1      A.   He said he had heard that I could help him
2  out on a case and wanted to know if I was interested.
3      Q.   All right.
4      A.   Gave me a brief description.
5      Q.   What was the brief description of the case
6  that he gave you?
7      A.   It was an arrest that was made in Grosse
8  Pointe Farms.  As a result of the investigation the
9  officer did there was no evidence in regard to chemical
10  tests that supported the arrest and wanted to know if I
11  could review the case for him.
12      Q.   Did you review the case?
13      A.   Yes, I did.
14      Q.   What materials from the case did you review?
15      A.   He provided me with the Complaint Report from
16  Grosse Pointe Farms Police.  Chemical tests.  The
17  chemical test rights form.  Two videos; one of the arrest
18  process and one of the booking process.
19      Q.   Anything else he provided you with?
20      A.   That's what I was given.
21      Q.   Anything else since that initial provision of
22  these materials that you have been provided?
23      A.   No.
24      Q.   Just so I'm clear.  You have not read the
25  testimony given by Mr. Thibault at his deposition?

BUGBEE                                          Page 22

1      A.   No.
2      Q.   That was taken in this very room when we
3  didn't have the lights that we have available today?
4      A.   No, I did not.
5      Q.   Likewise, I'm assuming you didn't review
6  Officer Wierszewski's deposition testimony?
7      A.   No, I did not.
8      Q.   Do you think that either the deposition
9  testimony of Mr. Thibault or Mr. Wierszewski would be of
10  importance to you to review prior to formulating
11  opinions?
12      A.   No.
13      Q.   Did you review Mr. Thibault's Answers to
14  Interrogatories?
15      A.   No.
16      Q.   Did you review Defendant Wierszewski's
17  Answers to Interrogatories?
18      A.   No.
19      Q.   Did you review the City of Grosse Pointe
20  Farms' Answers to Interrogatories?
21      A.   No.
22      Q.   Did you review Officer Wierszewski's Response
23  to Request for Production of Documents?
24      A.   No.
25      Q.   Did you review the City of Grosse Pointe

BUGBEE                                          Page 23

1  Farms' Answers to Request for Production of Documents?
2      A.   No.
3      Q.   Did you review any documents produced by
4  Mr. Thibault?
5      A.   No.
6      Q.   I'm assuming but you tell me.  Are you going
7  to render opinions today --
8           MR. DEGROOD:  Off the record.
9           (Brief recess.)
10           MR. DEGROOD:  Back on the record.
11           (Record repeated by reporter.)
12      Q.   Are you prepared to render any opinions today
13  critical of the City of Grosse Pointe Farms?
14      A.   Yes.
15      Q.   Are you prepared to render any opinions today
16  critical of Officer Wierszewski?
17      A.   I'll render my observations and they can be
18  interpreted as critical or not.
19      Q.   Excuse me?
20      A.   I'll render my observations and my opinion
21  and they can be interpreted as critical or not.
22      Q.   Well, how do you interpret them?  I would
23  like to know if you're criticizing Officer Wierszewski?
24      A.   No.  I think that's a harsh word.  I think I
25  will render my observations as to what I see.

BUGBEE                                          Page 24

1      Q.   Well, let me ask you this.  Do you believe
2  that Officer Wierszewski at any time with his interaction
3  with Mr. Thibault on December 5th, 2014, violated any
4  standard of practice that a reasonable and prudent
5  officer in like or similar circumstances with like and
6  similar training of Officer Wierszewski?
7      A.   Yes.
8      Q.   What's the next item that you brought with
9  you?
10      A.   This is something I referred to, as the
11  temperature that day was a factor in what I reviewed.  I
12  researched the National Weather Service.
13      Q.   For what city?
14      A.   Temperature for that day.  For Detroit.
15      Q.   Do you know if those temps are taken at Metro
16  Airport?
17      A.   This is likely taken at DTX.  That's Detroit
18  City Airport.
19      Q.   How far was that from the stop?
20      A.   This is Detroit City.  I'm a pilot so I'm
21  familiar with this.
22      Q.   I understand.  I read your C.V.  But this
23  case doesn't involve any flying, does it?
24      A.   I have a familiarity where City Airport is.
25  I'm just qualifying my capability.

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

1   Q.   How far was the City Airport from the stop?
2   A.   6 miles.  7 miles.
3   Q.   7 miles?
4   A.   Yeah.
5   Q.   What was the temperature at City Airport at
6   around two in the morning?
7   A.   It doesn't say.  It says a minimum
8   temperature and a maximum temperature and an average
9   temperature.
10  Q.   Of what significance was the temperatures
11  with respect to your formulation of opinions?
12  A.   Mr. Thibault said he was chilly.
13  Q.   Pardon me?
14  A.   Mr. Thibault said he was chilly.  He didn't
15  have a coat on.  One of the observations for -- one of
16  the pre-arrest observations that Officer Wierszewski made
17  was that he kept rubbing his hands and moving his feet up
18  and down.
19  Q.   Did you observe the videotape that recorded
20  the activities of the traffic stop at the scene where
21  Mr. Thibault rolled his sleeves up as he was walking back
22  to the police cruiser at the direction of Officer
23  Wierszewski?
24  A.   Yes.
25  Q.   Do you think that may have had any role to

1   play in his being chilly?
2   A.   Potentially.
3   Q.   Do you agree that if indeed the evidence in
4   this case indicates that Mr. Thibault was in the cab of a
5   semi-tractor with the heater on at the time of exiting
6   from the cab of that tractor, that more likely than not
7   he was not impacted by the chilliness, if you will?
8   A.   I don't know.
9   Q.   So that's a gray area with respect to
10  formulating your opinion.  Correct?
11  A.   I don't know how he felt, no.
12  Q.   You would agree that when it comes to
13  standard field sobriety testing, while the individuals
14  learning said techniques are taught same under ideal
15  conditions, that when officers actually enter the field,
16  there are times that less than ideal conditions exist
17  with respect to administering those field sobriety tests.
18  Correct?
19  A.   Correct.  And those conditions need to be
20  taken into consideration as to the interpretation of
21  their weight.
22  Q.   Do you have any evidence one way or the other
23  that Officer Wierszewski did not take the temperature at
24  the time of the traffic stop into consideration with
25  respect to his performing and observing the response to

1   the field sobriety testing given to Mr. Thibault?
2   A.   No.
3   Q.   Do you have any plans today or from today
4   forward to review Officer Wierszewski's deposition
5   testimony?
6   A.   I have not been asked to or directed by
7   Counsel to do so and I don't have plans.
8   Q.   Same question with respect to Mr. Thibault.
9   A.   I don't plan on that either.
10          MR. DEGROOD: I'm going to reserve
11  the right to again examine Mr. Bugbee should there
12  come a point in time that he does review those
13  materials for purposes of formulating or adding to
14  any of his opinions.
15          I don't think we marked the
16  temperature.  Let's do that next as No. 5.
17          (Deposition Exhibit No. 5 marked for
18  identification.)
19  Q.   What's the next item that you brought with
20  you today?
21  A.   Those are my written notes that I took from
22  my most recent review of the second NHTSA manual that I
23  had mentioned that are in discovery.  Those were prepared
24  over the weekend.
25  Q.   May I see those, please.

1          MR. DEGROOD: Let's do those.
2          (Deposition Exhibit No. 6 marked for
3          identification.)
4   Q.   With respect to your notes of Exhibit No. 6,
5   you have indicated on the first page:  Notes pertaining
6   to a phase one.  On the second page, notes related to a
7   phase two, which continue on to page three.  And on page
8   four a phase three, which is four, five, six, seven.  And
9   then a validation of SFST at page eight and then
10  standardized WAT on page nine in one leg stand.
11          It's my understanding that when NHTSA
12  explains the standardized field sobriety test that it breaks
13  it into a three phase study, the first being the initial
14  observations of vehicle operation.  Correct?
15  A.   Correct.
16  Q.   And you're not critical of Officer
17  Wierszewski for stopping Mr. Thibault as a result of the
18  erratic behavior -- those my terms -- of observing this
19  semi tractor-trailer being driven over a median island
20  separating the two directions of travel on Moross Avenue,
21  are you?
22  A.   No.
23          MR. RADNER: I want to just object
24  that that question had a -- it was a very lengthy I
25  think at times vague question.  To answer that with

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                                    Page 29

1      simply a yes or no I don't think is fair and
2      appropriate.
3      Q.    Let me ask you this question as well.  You
4   don't believe that Mr. Thibault's constitutional rights
5   were violated as a result of this traffic stop by Officer
6   Wierszewski, do you?
7              MR. RADNER: I'm going to object to
8      that as well that I don't believe he's qualified to
9      answer that question.
10             MR. DEGROOD: I think for many years
11     enforcing the laws, including the Constitution of
12     the State of Michigan, as well as the Constitution
13     of the United States, he may be capable of
14     answering that question.  If at a subsequent point
15     in time you wish to file a Motion to strike his
16     opinion concerning that, that is obviously your
17     prerogative.
18   Q.    Do you remember the question, Mr. Bugbee?
19   A.    Yes.  I don't know.
20   Q.    You don't know?
21   A.    I don't know.
22   Q.    Why don't you know?
23   A.    As Counsel had stated, I'm not qualified to
24   make that.
25   Q.    Would I be correct that you're not qualified

BUGBEE                                                    Page 30

1   to render any opinions whatsoever concerning the
2   constitutionality of any of the activities that were
3   performed by Officer Wierszewski with respect to his
4   interaction with Mr. Alan Thibault on December 5th, 2014?
5   A.    I don't know how to answer that question
6   either.
7   Q.    What do you mean you don't know how to answer
8   it?
9   A.    It would be premature for me to make any kind
10  of a determination as to the constitutionality of his
11  actions because I'm simply not trained to do that.
12  Q.    So is there some type of training you believe
13  could fall upon your lap, if you will, such that you
14  could render such an opinion?
15  A.    Probably law school.
16  Q.    But short of that you're not comfortable in
17  answering questions concerning constitutional violations
18  in this lawsuit.  Correct?
19  A.    Correct.
20  Q.    Now were there any phase one observations in
21  your opinion made by Officer Wierszewski?
22  A.    Yes.
23  Q.    Did he fail in any manner whatsoever, in your
24  opinion, to complete under the circumstances that were
25  existing at the time of his observation and traffic stop

BUGBEE                                                    Page 31

1   with respect to the observations of vehicle operation?
2   A.    Can I refer to the copy of my notes?  I have
3   my original.
4   Q.    You have your originals in there?
5   A.    Yes.
6              MR. RADNER: These notes have not yet
7      been marked, right?
8              MR. DEGROOD: Yes.  They're No. 6.
9              MR. RADNER: I thought he was
10     referring to the big stack of notes.
11  A.    I'm going to have to refer to the big stack
12  of notes.
13             MR. DEGROOD: Let's mark the big
14     stack of notes.  We'll mark that as Exhibit No. 7.
15             (Deposition Exhibit No. 7 marked for
16             identification.)
17  Q.    I'm going to hand you what has been marked as
18  No. 7.  What is that?
19  A.    This is my notes as to my observations of the
20  videotape, videotapes that were provided to me in regard
21  to the traffic stop and arrest process, as well as the
22  booking process.
23  Q.    Okay.
24  A.    Prior to Mr. Thibault being taken out of the
25  police department to get a blood test.

BUGBEE                                                    Page 32

1   Q.    With respect to Exhibit No. 6 that we
2   previously marked, in my review of those notes and given
3   your prior testimony, am I correct that the information
4   contained in the nine pages of Exhibit 6 are statements
5   that you retrieved from the NHTSA manual?
6   A.    Correct.
7   Q.    I notice that you did not write down any
8   pages with respect to where the quotations from the NHTSA
9   manual came from?
10  A.    No.
11  Q.    Any reason why not?
12  A.    I thought those were going to be used to just
13  refresh my memory as I testified here.  I didn't believe
14  they were going to be used for reference for anybody
15  else.
16  Q.    Did you actually procure the NHTSA standard
17  manual in printed form or only in electronic format?
18  A.    Electronic format.
19  Q.    On your version of the electronic format, did
20  you highlight any information contained within that
21  manual?
22  A.    No.  I made notes of the pertinent.
23  Q.    So if we were to look at the master manual we
24  won't find any underscores, any highlighted, none of
25  that?

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                                    Page 33

1    A.   No.
2    Q.   Because you took what you felt was important
3  from the manual and reproduced that in writing, which we
4  have marked as Exhibit 6?
5    A.   Correct.
6    Q.   Now let me see. I'm going to have Exhibit 7.
7  You have the original?
8    A.   I have the original.
9    Q.   Now I'm going to go back. You may use your
10  notes, obviously. My question to you is: Are you in any
11  fashion whatsoever going to render any opinion that
12  Officer Wierszewski failed to exercise a phase one
13  observation with respect to his stop of Mr. Thibault on
14  12-5-14?
15    A.   No. But I don't think that he observed much
16  driving. He saw it jumped the curb and the vehicle was
17  stationary when he rolled up on it.
18    Q.   He had opportunity to drive down and adjacent
19  to the vehicle and then to come up behind it. Correct?
20    A.   Correct.
21    Q.   You didn't review his deposition testimony to
22  learn if indeed there were any other observations that he
23  made that may not have been captured on that video.
24  Correct?
25    A.   Correct.

BUGBEE                                                    Page 34

1    Q.   So is that a criticism, the fact that he only
2  saw the vehicle move for the period that it did move and
3  strike the island separating the lanes of travel?
4    A.   It's merely an observation.
5    Q.   Again, if you were an officer investigating
6  the circumstances, you take the facts as they come your
7  way. Correct?
8    A.   I myself would have wanted to see more
9  driving prior to making that determination.
10    Q.   Well, are you aware of the fact that
11  Mr. Thibault has testified in this matter that as soon as
12  he saw the police officers he stopped his vehicle,
13  believing that he would be pulled over?
14    A.   No.
15    Q.   If that were the case then how in God's green
16  earth could any officer, including Officer Wierszewski,
17  have seen more driving?
18         Are you suggesting he should have gone
19  to the driver of this semi tractor-trailer, after observing
20  it jump the curb, if you will, and ask him to drive a
21  quarter mile so I can watch your activity behind the wheel?
22         MR. RADNER: I'm going to object.
23  It's a compound question. It's calls for
24  speculation.
25         You can answer, if you can.

BUGBEE                                                    Page 35

1    Q.   Go ahead.
2    A.   I would like you to simplify the question
3  because I got lost. I wanted to answer the first part of
4  it and I got lost.
5    Q.   Are you suggesting that to comply with phase
6  one observations that Officer Wierszewski should have
7  directed this driver, Mr. Thibault, to continue driving
8  the vehicle such that he, Officer Wierszewski, could have
9  additional observational information regarding
10  Mr. Thibault's operation of the truck?
11    A.   No.
12    Q.   Do you know how many officers observed Mr.
13  Thibault's operation of the semi tractor-trailer on
14  12-5-14?
15    A.   From the video it appeared to be Officer
16  Wierszewski and Officer Cashion in two separate patrol
17  cars.
18    Q.   So that would be two?
19    A.   Yes.
20    Q.   Now any other statements you would like to
21  make with respect to a phase one observation, in addition
22  to you would have liked to have seen more driving under
23  these circumstances?
24    A.   Yes.
25    Q.   What would that be?

BUGBEE                                                    Page 36

1    A.   I believe in the officer's report he
2  indicated that the truck was stationary at the
3  intersection with its four way flashers flashing.
4  However, when I reviewed the video it was clear that from
5  the system that they have that, the four way or -- excuse
6  me -- the patrol car lights were activated at 1:48 and 21
7  seconds a.m., which initiates the traffic stop. The semi
8  four ways didn't become active for another seven seconds,
9  which tells me that the driver of the vehicle was
10  responding to the signal from the officer to pull over or
11  he was being stopped.
12    Q.   All right.
13    A.   That tells me a lot about his capability to
14  negotiate what is going on around him and to change his
15  task from driving the vehicle to now complying with the
16  officer's request for him to pull over basically.
17    Q.   In your review of the video of the stop did
18  you at any point in time see the semi tractor-trailer
19  moving?
20    A.   I saw it stationary at the corner of Moross
21  and Mack with the left turn signal. Looked like he was
22  waiting for the light to turn. So he was operating the
23  vehicle in the left lane of traffic.
24    Q.   My question was: Did you at any time see
25  movement of the tractor-trailer on the video: Yes or no?

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                          Page 37

1    A.   No, I did not.
2    Q.   Any other criticisms of Officer Wierszewski
3  with respect to his phase one observations?
4    A.   He had said there was a -- when Officer
5  Wierszewski approached the driver or talked to him at
6  some point, that his trailer clearance lights
7  were out.  But it appeared that from the video that the
8  clearance lights were operative.
9    Q.   Were you able to see -- well, strike that.
10        First off, as a Michigan State Police
11  Officer, did you ever receive any specialized training in
12  commercial vehicle inspections?
13    A.   Yes.
14    Q.   Were you ever involved in the Motor Carrier
15  Division of the Michigan State Police?
16    A.   No.  But we were trained to motor carrier
17  standards in the Basic Academy.
18    Q.   You would agree that the video that you saw
19  did not provide any observational abilities of any of the
20  clearance lights on the front of that trailer.  Correct?
21    A.   Correct.
22    Q.   So you don't know, not having read Officer
23  Wierszewski's deposition, which of the clearance lights
24  that he was referring to.  Correct?
25    A.   Correct.

BUGBEE                                          Page 38

1    Q.   So the fact that you saw operational clearing
2  lights on the rear of this trailer does not rule out the
3  fact that lights on the front of the trailer were
4  inoperable.  Correct?
5    A.   Correct.  I was basing it on my observation.
6    Q.   So you wouldn't be critical of Officer
7  Wierszewski with respect to his observation of a
8  clearance lamp not working, if indeed it were his
9  testimony it was on the front of the trailer.  Correct?
10    A.   Correct.
11    Q.   What about the license plate lamp, was that
12  operable or couldn't you tell?
13    A.   Couldn't tell.
14    Q.   Anything else that you are critical of
15  Officer Wierszewski with respect to what he had to work
16  with for a phase one observation of this scenario as per
17  the NHTSA standard field sobriety testing training?
18    A.   I'm not critical of his stop but I don't
19  think it provided indications of intoxicated driving.
20    Q.   What did it provide?
21    A.   It provided indication of a civil infraction,
22  perhaps improper lane use.  That was it.
23    Q.   Well, do you have any basis upon which to
24  conclude that at any time before Officer Wierszewski
25  moved on to a phase two or phase three observation, had

BUGBEE                                          Page 39

1  formulated any opinion with respect to Mr. Thibault
2  operating under the influence of alcohol or drugs?
3    A.   I don't know how he formed his opinion.
4    Q.   It would be important to know what of a phase
5  one, phase two and/or phase three observation an officer
6  utilizes in determining to arrest someone for OWI.
7  Correct?
8    A.   Could you rephrase that.
9        MR. DEGROOD: Could you read that
10  back to him, please.
11        (Record repeated.)
12    Q.   That would be important?
13        MR. RADNER: I'm just going to
14  object.  Important for what.
15    Q.   Important if possible, correct?
16    A.   If possible.
17    Q.   What do you mean by that?
18    A.   It's kind of a vague question.
19    Q.   Anything else that you're critical of with
20  respect to the phase one portion of this stop?
21    A.   No.
22    Q.   What is the phase two portion of the NHTSA
23  training for standard field sobriety testing?
24    A.   Contact with the driver.
25    Q.   Did Officer Wierszewski have any involvement

BUGBEE                                          Page 40

1  in personal contact with Mr. Thibault?
2    A.   Yes.
3    Q.   Are you at any point in time offering any
4  opinions that Officer Wierszewski failed to complete a
5  phase two portion of his examination of Mr. Thibault?
6    A.   I think he completed the examination.
7    Q.   Did he complete the phase two examination in
8  keeping with the standards expected of him as a
9  reasonable and prudent public safety officer under the
10  circumstances as they existed on December 5th, 2014?
11    A.   Yes.
12    Q.   What is the phase three portion of the NHTSA
13  training?
14    A.   It's the standard field sobriety tests.
15    Q.   How many standard field sobriety tests are
16  there that are recognized within the battery of available
17  standard field sobriety tests?
18    A.   There are three scientifically validated
19  tests.
20    Q.   Those are?
21    A.   The horizontal gaze nystagmus.  The walk and
22  turn and the one leg stand.
23    Q.   Would I be correct that as a field training
24  officer, when you were so engaged and employed with the
25  Michigan State Police, that you would have instructed

BUGBEE                                          Page 41

1  those officers training in the field with you to
2  additional field sobriety testing over and above those
3  three. Yes or no?
4      A.   Yes.
5      Q.   What additional field sobriety testing, over
6  and above the three that you have described, would you
7  instruct your fellow officers that were within your
8  charge as an FTO?
9      A.   There are other non validated tests which can
10  be used.
11      Q.   Which ones would you have trained individuals
12  in? And by the way, when you say: Validated versus non
13  validated, what do you mean by that?
14      A.   Well, through NHTSA standards there are only
15  three scientifically validated tests which would be used
16  to make the arrest decision. Those are the three
17  aforementioned tests that I said.
18      Q.   When you say "validated" how are they
19  validated, if you know?
20      A.   They were scientifically validated through
21  studies in the eighties.
22      Q.   Were you involved in any of those studies?
23      A.   No.
24      Q.   Have you reviewed the results of any of those
25  studies?

BUGBEE                                          Page 42

1      A.   No.
2      Q.   Your familiarity with the alleged validation
3  is basically through the statements that NHTSA makes in
4  its manuals. Correct?
5      A.   Through my training and the alcohol
6  enforcement, the standard field sobriety testing courses
7  I have taken such that those were all covered. There
8  were segments that talked about the scientific studies
9  that were done.
10      Q.   Did you at any point in time in your career
11  as a Michigan State Police Officer, ever arrest a subject
12  that you believed was operating under the influence but
13  at or near the time of arrest had a negative PBT that you
14  subsequently had blood samples drawn that ultimately came
15  back negative for alcohol and negative for drugs even
16  though you had arrested the individual for OWI?
17      A.   Not that I recall.
18      Q.   But you haven't gone back and looked at all
19  of your stops, have you?
20      A.   No.
21      Q.   You would agree that indeed an officer may
22  have probable cause to arrest someone for OWI who has
23  blown negative or zero results on a PBT. Correct?
24      A.   Correct.
25      Q.   You likewise understand that an officer may

BUGBEE                                          Page 43

1  have probable cause to arrest someone for OWI in advance
2  of the results of blood tests for alcohol becoming
3  available for that officer. Correct?
4      A.   Yes.
5      Q.   In fact, when you were pulling people over as
6  a Michigan State Police Officer or Trooper, were there
7  times that you needed to have blood drawn?
8      A.   Yes.
9      Q.   It's my understanding when that occurred the
10  blood sample was not immediately analyzed and more likely
11  than not was not analyzed even within 48 to 72 hours of
12  the arrest. Correct?
13      A.   Correct.
14      Q.   Your blood samples, I'm assuming, like the
15  sample drawn on Mr. Thibault would go to the Michigan
16  State Police Crime Lab. Correct?
17      A.   Yes.
18      Q.   Likewise, would you agree that an officer
19  could make an arrest of somebody for OWI with probable
20  cause, even though a blood sample for drugs that had been
21  removed had not yet had the findings returned?
22      A.   Correct.
23      Q.   Did you review any of the laboratory reports
24  generated in this case with respect to blood samples
25  removed from Mr. Thibault?

BUGBEE                                          Page 44

1      A.   Yes.
2      Q.   Which ones?
3      A.   They were provided to me as part of the
4  Complaint Report that I talked about from the --
5      Q.   Could I see what you're referring to as the
6  Complaint Report?
7      A.   This is listed as Grosse Pointe Farms Public
8  Safety Complaint report No. 140005021. Happened 12-5 of
9  2014, by Officer Wierzewski.
10      Q.   Did you make a copy of that to give to me as
11  a result of the Notice to Produce?
12      A.   I believe that's on the disc that I gave you.
13      Q.   You just put together that report in its
14  entirety from your original that I might quickly review.
15      A.   Pardon me?
16      Q.   May I see what you're calling the compendium
17  of the report. You just put it together.
18          MR. DEGROOD: Solomon, he can do it.
19          MR. RADNER: I'm just looking at what
20      he's doing.
21          MR. DEGROOD: Slipping the Joker in
22      the deck, are you?
23          MR. RADNER: The record should be
24      very clear that I have not touched the documents.
25      I'm merely looking over his shoulder.

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

1    A.    Would you like me to state for the record
2  what is in here?
3    Q.    If you could just hand it to me when you have
4  got it all put together. I'll even let you borrow a
5  paperclip if you would like.
6    A.    Okay. I'm handing to you what was given to
7  me by Counsel and stated to be the Police Report.
8    Q.    Thank you.
9    A.    Containing the aforementioned or afore
10  requested -- if that's a word -- chemical test results.
11               MR. DEGROOD: Let's mark this as an
12     Exhibit and count the pages, please.
13               (Deposition Exhibit No. 8 marked for
14               identification.)
15    Q.    I'm going to show you what we have marked as
16  Exhibit 8 to your deposition. There are 17 pages.
17  Specifically I want to go through the laboratory results.
18    A.    Yes.
19    Q.    First off, when was this report authored to
20  the best of your knowledge?
21    A.    Well, it says a report date and time 12-5 of
22  '14 at 2:19 p.m. That doesn't tell me when it was
23  authored though.
24    Q.    All right.
25    A.    Excuse me. Stop.

1    Q.    Go ahead.
2    A.    Created on -- now this date here on the
3  bottom of page two of four states it was created on
4  12-19, 2014 at 2:09 p.m.
5    Q.    Do you know if that's just the time that the
6  copy that we have marked was made at the time as opposed
7  to the actual creation of same?
8    A.    I don't know.
9    Q.    We do know from your review of Exhibit No. 8,
10  that the blood samples were drawn on 12-5, 2014.
11  Correct?
12    A.    Yes. Well, that would not be on this sheet.
13  It would be on another sheet.
14    Q.    It clearly would be on --
15    A.    That would be on this one. This is the one
16  the officer would have to fill out and that says 12-5 of
17  '14.
18    Q.    The date of collection, right?
19    A.    Right.
20    Q.    Now there are two pages in here.
21    A.    Yes.
22    Q.    That are Specimen Result Certificate.
23  Attention: Kacey Hothem.
24    A.    Uh-huh.
25    Q.    You believe these are part of the actual

1  Grosse Pointe Farms Police Report?
2    A.    No. These were provided to me as well as the
3  report by Counsel.
4    Q.    These were what? What are these the labs
5  from?
6    A.    Those look like a private test that was
7  sought by Mr. Thibault.
8    Q.    You didn't read his deposition though,
9  correct?
10    A.    No, I didn't.
11    Q.    Now did you ever receive the laboratory
12  report from the Michigan State Police relative to an
13  alcohol study performed by the Department of State Police
14  Forensic Science?
15    A.    That's not in this information, no.
16    Q.    The lab report that clearly is a copy of the
17  State of Michigan, Department of State Police is related
18  to a blood sample that relates to whether or not drugs
19  were included. Correct?
20    A.    Well, I don't know what they tested for but
21  they say what the results are.
22    Q.    And they show that they didn't find the drugs
23  that are specifically identified in the document.
24  Correct?
25    A.    It says item number one not detected and it

1  shows a whole list of drugs that were not detected.
2    Q.    Correct. Now you're not a toxicologist,
3  correct?
4    A.    No, I am not.
5    Q.    I'm assuming you have already told me you
6  didn't have any training as a drug recognition expert.
7  Correct?
8    A.    Correct.
9    Q.    Would I also be correct that you have
10  received no training with respect to what particular
11  designer drugs may have been utilized by the public in
12  December of 2014. Is that fair enough?
13    A.    That's not a yes or a no question. I
14  received extensive training in basic and advanced
15  narcotics with the Michigan State Police as to the
16  existence and effects of many types of drugs.
17    Q.    In that training you're aware of the fact
18  that some of these -- I'll use the term designer drugs --
19  metabolize out of an individual's system even before a
20  blood sample can be retrieved, correct?
21    A.    I don't know.
22    Q.    That's beyond your expertise?
23    A.    I would have to review my past training
24  materials and such to prepare for that question. I don't
25  know which ones would, to render a definitive answer.

Alan Thibault v.
Edward Wierszewski

**Marty Bugbee**
**February 23, 2016**

---

BUGBEE                                        Page 49

1    Q.   I'm just asking, not specifically but in a
2  general sense, you are aware of the fact that some drugs
3  can metabolize out of someone's system before a blood
4  sample is even retrieved?
5    A.   No.  I'm not aware of that.
6    Q.   Are you aware of the fact that some drugs can
7  metabolize out of a blood sample that is merely sitting
8  in a vial waiting to be tested?
9    A.   No.
10   Q.   That's beyond your training?
11   A.   No.  It may have been -- it was certainly
12 within my training I'm willing to say but as far as if I
13 remember that part of it, no.  I don't remember that.
14   Q.   So as you sit here today you're not rendering
15 any opinions on that topic?
16   A.   Correct.
17   Q.   Now let's go back to our face three, which is
18 what, pre-arrest training and screening?
19   A.   Correct.
20   Q.   Now with respect to the phase three
21 pre-arrest screening of the NHTSA training, are you in
22 any way critical of Officer Wierszewski's performance of
23 any pre-arrest screening?
24   A.   I don't believe they provided probable cause
25 to make the arrest.

---

BUGBEE                                        Page 50

1    Q.   So it is your opinion that in your judgment
2  what you saw with respect to these three scientifically
3  discussed and verified standardized field sobriety tests,
4  in your opinion it didn't provide probable cause,
5  correct?
6             MR. RADNER:  I'm just going to object
7      to that question that there was a lot more in the
8      video than just those three scientific tests.  But
9      if you understood the question and you can answer
10     it with a yes or a no, please feel free.
11   A.   Can you ask the question again, please.
12   Q.   Sure.  First off, what field sobriety tests
13 in your opinion were performed if any that provided
14 probable cause of operation OWI by Mr. Thibault on the
15 day in question?
16   A.   In my observation it's my opinion none of the
17 tests -- which include the three standardized tests as
18 well as all the additional tests that he gave him -- rose
19 to the level of probable cause to make an arrest.
20   Q.   You weren't there that evening, correct?
21   A.   No.  This is based on an observation of the
22 video.  Yes.
23   Q.   Did you see all of the testing that was
24 performed upon Mr. Thibault at the station that may not
25 have been captured on any video?  Yes or no?

---

BUGBEE                                        Page 51

1    A.   No.
2    Q.   Is there any aspect of the three standardized
3  tests that you believe were not appropriately
4  administered by Mr. Wierszewski?
5    A.   Yes.
6    Q.   Let's start with the walk and turn.  Was that
7  properly administered?
8    A.   It was properly administered.
9    Q.   It was?
10   A.   Yes.
11   Q.   On how many occasions?
12   A.   Two that I saw.
13   Q.   Where were they, the ones that you saw, where
14 were they occurring?
15   A.   There were two that were administered on the
16 road.
17   Q.   At the stop?
18   A.   Yes.
19   Q.   Do you believe either of those -- let's talk
20 about the first one.  The first one that was administered
21 was witnessed, to your knowledge, by how many officers of
22 Grosse Pointe Farms?
23   A.   Two.
24   Q.   Which two?
25   A.   Based on just what was going on in the video

---

BUGBEE                                        Page 52

1  I think it was Officer Wierszewski and Officer Cashion.
2  She was continually referred to as Veronica.  So I
3  presume that's her.
4    Q.   By the way, you did review the drug
5  evaluation form that was completed by Officer
6  Wierszewski, correct?
7    A.   Yes.
8    Q.   Am I correct that at no time during your
9  professional activities did you ever complete those types
10 of tests and fill out that type of a form?
11   A.   We filled out those types of a form.
12   Q.   Those exact forms?
13   A.   Not that exact form.  That type of form that
14 documented our observations in the standard field
15 sobriety testing.
16   Q.   Did you ever take blood pressure of subjects?
17 Yes or no.
18   A.   No.
19   Q.   Did you ever take temperatures of subjects?
20 Yes or no?
21   A.   No.
22   Q.   Did you ever complete any eye examinations in
23 addition to the vertical or horizontal gaze nystagmus
24 test:  Yes or no?
25   A.   Yes.

---

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

1  Q.   Which ones did you complete besides that?
2  A.   Pupil size.
3  Q.   What other tests are recorded on the DRE form
4  completed by Officer Wierszewski -- and, please, you may
5  refer to it -- that you would not have completed in your
6  analysis of a subject that you were evaluating for
7  possible arrests of OWI?
8  A.   We never did pulse and time.
9  Q.   All right?
10  A.   We never did convergence.  Never did the
11  internal clock test.  The forms that we filled out didn't
12  have a section for nasal area, however, had that
13  observation been made it would have been put in a report.
14  Rebound dilation was a part of the horizontal gaze
15  nystagmus training examination.  Reaction to light was
16  not.
17           Forms I used didn't have a diagram to
18  mark their arms.  This one has a right arm and a left arm.
19  It didn't have it.  We didn't take their blood pressure.  We
20  didn't do their temperature.  If things like muscle tone
21  were pronounced enough to notice, we would have documented
22  that in a narrative.  That's the only examinations that are
23  on this form, that were not examined in the past that I
24  recall.
25  Q.   Okay.  Were you trained to observe and make

1  conclusions with respect to whether or not a subject was
2  under the effects of a central nervous system stimulant?
3  A.   Yes.  The training I went through covered
4  that.
5  Q.   What stimulants would you look for and what
6  were the -- strike that.
7           What were the CNS symptoms that would
8  lead you to believe that a subject was under the influence
9  of a stimulant?
10  A.   Well first, presence of drugs or drug
11  paraphernalia during the phase two.  In general, if they
12  were to pass the three validated tests, that being the
13  horizontal gaze nystagmus, the walk and turn and the one
14  leg stand.  If their pupils were an uneven size and they
15  also had vertical gaze nystagmus that may indicate some
16  drug use.
17  Q.   Stimulant versus a depressant?
18  A.   What about it?
19  Q.   Well, I'm asking you what you look for to
20  determine if someone is potentially under the influence
21  of a CNS stimulant versus a CNS depressant, if you know?
22  A.   Within the scope of my background and
23  training, having not gone through the drug recognition,
24  we would have recognized a potential presence of some
25  drugs and moved on from there.

1  Q.   All right.  The vertical gaze nystagmus is
2  not one of the scientifically verified tests?
3  A.   No, it's not.
4  Q.   Now did you record in your notes the time on
5  the tape that you believe depict Mr. Tibault's efforts at
6  completing the first walk and turn?
7  A.   Yes.
8  Q.   On what page of your notes is this?
9  A.   Page four.
10  Q.   Page four?
11  A.   Yes.
12  Q.   That would be what we have marked as
13  Exhibit 7, correct?
14  A.   Yes.
15  Q.   The four is circled in the upper right hand
16  corner.  Correct?
17  A.   Yes.
18  Q.   What was the time on the tape that you have
19  indicated the first walk and turn was attempted by the
20  plaintiff?
21  A.   1:53 and 25 seconds a.m.  That was when the
22  instructions were began.
23  Q.   I think you told me that the administration
24  of that test by Officer Wierszewski was proper, correct?
25  A.   Yes.

1  Q.   Did you see any indication on your review of
2  Mr. Thibault's first walk and turn that indicated he was
3  unsteady and using his arms for balance?
4  A.   Yes.
5  Q.   Is that an indication of possible influence
6  by alcohol or drugs with respect to the walk and turn?
7  A.   Yes.
8  Q.   Did you see any evidence, physical evidence,
9  during the first Thibault walk and turn that we're
10  talking about that suggested to you that Mr. Thibault was
11  under the influence of alcohol or drugs?
12  A.   No.
13  Q.   None?
14  A.   None.  Not in my opinion.
15  Q.   You would agree that other individuals could
16  clearly differ with your opinion, correct?
17           MR. RADNER: Objection.  Speculation.
18  Q.   Go ahead.
19  A.   Others could.
20  Q.   Have you shown this video footage that we're
21  discussing to any other actively employed officers,
22  either Michigan State Police or other certified law
23  enforcement officers, and requested their opinion as to
24  whether it is demonstrative or not of someone impaired?
25  A.   No.

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                        Page 57

1    Q.    What did you see during this first walk and
2  turn that lead you to believe and conclude no probable
3  cause existed to suspect impaired individual?
4    A.    Well, during the instruction phase Mr.
5  Thibault was very steady.  He maintained the position
6  that the officer asked him to while he was giving
7  instructions.  Okay.  As he performed the test, though he
8  did use his arm to balance, it didn't appear as though he
9  stepped off the line.
10            He did the proper amount of steps, which
11  indicated that he had understood the questions, recalled
12  them correctly and executed it properly.  He did a good turn
13  without losing control there and walked back.  So in all,
14  the only thing I saw him do which may raise some suspicion
15  was he raised his arms above six inches to maintain his
16  balance.
17    Q.    Did he maintain an upright position of his
18  upper trunk as he completed the walk and turn we are
19  discussing?
20    A.    At one point it seems as though he lost his
21  balance but did not step off the line.
22    Q.    Were you able to see his feet in the video
23  that was provided to you:  Yes or no?
24    A.    No.
25    Q.    All right.  So when he appeared to lose his

BUGBEE                                        Page 58

1  balance you cannot objectively state that he did or did
2  not come off the line.  True?
3    A.    It appeared as though he stayed on the line
4  to me.
5    Q.    You cannot objectively state -- because you
6  were not present -- that he did or did not come off the
7  line.  Correct?
8    A.    Correct.
9            MR. RADNER:  Asked and answered.
10    Q.    You would agree that Officer Wierszewski and
11  Officer Cashion would be in a better vantage point being
12  at the scene to determine if indeed at any time during
13  the first walk and turn Mr. Thibault came off the line.
14  True?
15    A.    True.
16    Q.    Any other comments that you have with respect
17  to his first walk and turn?
18    A.    Yes.
19    Q.    What would that be?
20    A.    I would have evaluated that as a pass or a
21  good test.  I would not have felt that was a fail based
22  on my observations.
23    Q.    All right.  Anything else that you wish to
24  comment on that first walk and turn?
25    A.    No.

BUGBEE                                        Page 59

1    Q.    Now -- do you need a break?
2    A.    Bathroom.
3            MR. DEGROOD:  Let's go off the
4      record.  We'll take a break.
5            (Brief recess.)
6    Q.    How many one leg stands did you observe on
7  the videos that you watched?
8    A.    I observed one.
9    Q.    In your notes do you have the notation as to
10  the time on the tape it occurred?
11    A.    Yes.  1:55 and 06 seconds a.m.
12    Q.    It's on page four as well?
13    A.    Four, yes.
14    Q.    Did you believe that you saw anything during
15  the performance of that test that lead you to believe it
16  was administered inappropriately?
17    A.    No.
18    Q.    Did you find anything during that test that
19  lead you to believe possibly probable cause existed that
20  this individual was impaired?
21    A.    No.
22    Q.    What during this test lead you to believe
23  that this individual was not impaired?
24    A.    Well, during the two phases of the test, the
25  instruction phase and the performance phase.  During the

BUGBEE                                        Page 60

1  instruction phase Mr. Thibault was instructed to stand in
2  a certain position.  Take that position until instructed
3  to perform the test.  He did so as instructed.  I think
4  he had to move to do it from his back to the camera to
5  side to the camera and he was -- he followed instructions
6  well.
7            There was no confusion.  When he was
8  standing in that position listening to the instructions he
9  maintained the position.  No swaying.  No difficulty.  He
10  paid attention to the instructions.  When told to do the
11  test -- let me correct that.
12            There was one thing that Officer
13  Wierszewski did do.  He stopped observing Mr. Thibault for a
14  moment.  He returned to the patrol car.  Then came back.  So
15  his observation stopped for a moment.  At 1:55 and 53
16  seconds he instructed him to move to a different position.
17            He resumed another position which was --
18  could be more favorable to the camera.  He followed the
19  instructions well.  There was no swaying and looked like he
20  had good balance as he listened to the instructions.
21    Q.    Okay.
22    A.    At 1:56 and 59 seconds, Officer Wierszewski
23  instructed Mr. Thibault to start the test.  Instructed
24  him to lift his foot higher than six inches at one point
25  it appeared.  He left him in that position for what was a

Alan Thibault v.                                                                    Marty Bugbee
Edward Wierszewski                                                          February 23, 2016

BUGBEE                                                  Page 61

1   35 count. That was Mr. Thibault counting, which
2   according to the tape was actually 24 seconds. At 1:56
3   and 35 seconds he instructed Mr. Thibault to put his
4   foot down.
5             My observations was that the test was
6   done properly. He had slight raising of the arms for
7   balance. Proper count. And the tempo was good. There was
8   no slurred speech as he was speaking and counting out. He
9   had no loss of balance. He was able to complete the test
10  without putting his foot to the ground.
11  Q.   Anything else with respect to the one leg
12  stand?
13  A.   Like I said, at one point it appears as
14  though he instructed him to lift his leg higher than
15  six inches. He kept telling him: Higher, higher,
16  higher, which put Mr. Thibault in a difficult position to
17  maintain his balance.
18  Q.   Would you agree that when he was instructed,
19  Mr. Thibault that is, to raise his foot higher, the
20  camera did not allow the viewer of the video to actually
21  see how high the foot was?
22  A.   Correct. But the position of the knee and
23  the lower leg appeared though it was higher than the
24  six inches.
25  Q.   Do you know how tall he was?

BUGBEE                                                  Page 62

1   A.   No.
2   Q.   Would you agree that Officer Wierszewski and
3   Officer Cashion would be in a better vantage point to
4   determine if indeed he was requested to lift his knee
5   only six inches and upon failing to do so, was instructed
6   to attempt to return to six inches?
7   A.   They would be in a better vantage point to
8   observe that.
9   Q.   In addition to the three standardized field
10  sobriety tests that you have identified, what additional
11  sobriety, field sobriety tests were administered?
12  A.   There were many.
13             MR. RADNER: Are we still on the one
14      leg stand or are we moving on?
15             MR. DEGROOD: We're talking about
16      what other tests were administered over and above
17      the three standardized field sobriety tests.
18  A.   It appears as though there were four
19  additional tests given. Some of them were given more
20  than once.
21  Q.   Which were they?
22  A.   The alphabet was given twice. Or actually he
23  started the instructions for the alphabet. Officer
24  Wierszewski started the instructions for the alphabet and
25  then he had him take the numbers test and then he

BUGBEE                                                  Page 63

1   returned to the alphabet again and had him do the
2   alphabet. So it wasn't performed twice but it was broken
3   because it was mixed in with the numbers test.
4   Q.   Did he successfully complete the numbers
5   test?
6   A.   He successfully completed the numbers test.
7   Q.   That test is the test where he was asked to
8   pick a number between 19 and 21?
9   A.   Well, my observations of that were he
10  followed the instructions well. There was no confusion
11  as to what was being asked. There was no slurred speech.
12  He gave a proper answer.
13  Q.   Did he successfully complete the alphabet
14  test?
15  A.   It appears as though he was confused about
16  the -- what was being asked of him. But it was broken
17  down into two sections between the -- at 1:52 and 21
18  seconds, Officer Wierszewski asked him if he knows his
19  alphabet from A to Z. He responded yes.
20  Q.   Where was he standing when that question was
21  asked of him?
22  A.   He was standing in front of the patrol car
23  right in front of the camera. At that point he was asked
24  to turn and face the truck.
25  Q.   Do you recall if he was asked if he knew the

BUGBEE                                                  Page 64

1   alphabet when he was standing outside the cab to the
2   semi-truck?
3   A.   That's what I'm talking about right now. He
4   was --
5   Q.   So he was not directly in front of the hood,
6   if you will, of Officer Wierszewski's car when he was
7   asked if he knew the alphabet. Correct?
8   A.   He was through -- at this particular test
9   this time, he was asked at 1:52 and 21. He was standing
10  in front of the patrol car with his face to the patrol
11  car. After he was asked if he knew the alphabet he was
12  asked to turn and face the truck. I notice he made the
13  turn, 180-degree turn, steady. Followed instructions
14  well. No swaying. No staggering. So that's what I
15  observed.
16  Q.   All right. Do you remember what he was
17  subsequently instructed with respect to the alphabet
18  test?
19  A.   Yes. At 1:52 and 42 seconds, after having
20  successfully completed the numbers test, Officer
21  Wierszewski then returned to the alphabet test and told
22  him to recite the alphabet, starting with D and ending
23  with O.
24  Q.   Did he start with D or start with A?
25  A.   He mumbled A through C to get him to D. He

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

1 recited D. Went all the way to V and then returned to O.
2     Q.   So that would be interpreted by some
3 individuals as a failed test. True?
4     A.   No, because there's other observations that
5 need to be taken into account.
6     Q.   What other observations?
7     A.   Although he did the test improperly, he did
8 it with clear speech. He wasn't confused. Although he
9 did it wrong, he wasn't necessarily confused. The
10 letters were said in sequence or the letters were said in
11 sequence. He maintained a steady position of balance
12 throughout the test.
13         I interpreted as though he was confused
14 of what he was asked because it was never said, quote,
15 without saying any other letters. He just said: Go from D
16 to O. He didn't say: Don't say any other letters.
17     Q.   All right. Any other tests that are field
18 sobriety tests other than the three standardized field
19 sobriety tests, of which we have already spoken about
20 two?
21     A.   Finger count. He did the finger count at
22 1:52 and 59 seconds.
23     Q.   Anything else?
24     A.   He, at 1:56 and 38 seconds, he did a modified
25 Romberg.

1         MR. RADNER: Can you spell that
2 please?
3         THE WITNESS: R-o-m-b-u-r-g, I
4 believe.
5     Q.   What is the modified Romberg?
6     A.   Well, that was instructed to be: Close his
7 eyes. Hold his head back. And I don't believe that was
8 instructed properly based on the NHTSA guidance. But he
9 was instructed to hold his head back. Close his eyes and
10 let him know when 30 seconds were over.
11     Q.   What was improper with respect to that
12 instruction?
13     A.   It doesn't instruct that the driver or
14 suspect is to count in their head. It just says: Let me
15 know when you think 30 seconds is over at the end of the
16 test.
17     Q.   Isn't that implied, if you are going to let
18 me know when 30 seconds are over that you're counting in
19 your head?
20     A.   But that's not part of the test to ask how
21 they counted. That seemed to be important to Officer
22 Wierszewski, the manner in which he counted. That's not
23 even instructed in the NHTSA manual. So it just wasn't
24 in compliance with the way they instructed.
25     Q.   With the way that you instructed, correct?

1     A.   The way it said in the manual.
2     Q.   Well, the manual covered non-verifiable field
3 sobriety testing and if so what manual was that?
4     A.   That was the aforementioned manual that I had
5 spoken of, being the Advanced Road Side Impaired Driving
6 Enforcement Manual.
7     Q.   Now that you had the hard copy there what was
8 the edition of that again?
9     A.   That was the R5 slash 13 edition.
10     Q.   Okay.
11     A.   As stated earlier.
12     Q.   Any other field sobriety tests that were
13 performed that we haven't talked about, knowing full well
14 that there is a second walk and turn and we have not yet
15 talked about the HGN?
16     A.   No.
17     Q.   Was the HGN test performed?
18     A.   Yes.
19     Q.   Do your notes reflect at what time on the
20 tape that you were provided you saw the HGN test
21 performed?
22     A.   1:58 and five seconds a.m.
23     Q.   Was it administered properly?
24     A.   I don't believe so.
25     Q.   In addition to the belief that it was not

1 properly administered, any other criticisms of the manner
2 in which that test was conducted?
3     A.   No.
4     Q.   With respect to the administration of that
5 test, what is it that you believe was improperly
6 completed or completed?
7     A.   Well, it appeared as though it was mixed with
8 another test that is called the lack of convergence test.
9 So there was --
10     Q.   What page are you reading from Exhibit 7?
11     A.   Five.
12     Q.   Page five. Thank you. Continue, please.
13     A.   It appeared that the HGN test, the horizontal
14 gaze nystagmus, was conducted in conjunction with the
15 lack of convergence test, which are two different tests.
16 They were both mixed into one test, which I believe
17 complicates the horizontal gaze nystagmus in that the
18 NHTSA guidance warns of fatiguing the eyes prior to
19 getting or prior to getting a good test. Eye fatigue is
20 a factor and a negative HGN test for the NHTSA guidance.
21     Q.   Was there a negative HGN test?
22     A.   I don't believe there was.
23     Q.   What do you believe -- again, let me just see
24 that I'm clear. The video that you were provided with
25 when the HGN test, and in your opinion the co-mingled

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                             Page 69

1  convergence test occurred, you could not see the face or
2  eyes of the subject. True?
3      A.    True.
4      Q.    Mr. Thibault's back was facing the camera.
5  Correct?
6      A.    Correct.
7      Q.    So neither you nor I or someone who only has
8  benefit of looking at this tape, we cannot objectively
9  state what the actual response Mr. Thibault had to that
10  test or in your opinion tests pleural. True?
11      A.    True.
12      Q.    Were the results of the HGN test recorded
13  anywhere in the records completed by Officer Wierszewski?
14      A.    They were captured on the videotape.
15      Q.    Are they identified anywhere in his written
16  report?
17      A.    No.
18      Q.    So there's nothing mentioned in the DRE
19  report about that?
20      A.    He says he failed the HGN test but I don't
21  know which one it was. He gave it to him three times.
22      Q.    So that test was provided in your opinion to
23  the subject on three occasions. Correct?
24      A.    Correct.
25      Q.    Were any of those occasions when the subject

BUGBEE                                             Page 70

1  was at the station after being removed from the stop?
2      A.    Yes.
3      Q.    Do you know how much time elapsed between
4  those tests?
5      A.    Yes.
6      Q.    How much time elapsed -- well, strike that.
7            How many HGN's did you see administered
8  at the scene of the stop?
9      A.    One.
10      Q.    How many did you see administered at the
11  station?
12      A.    At least one. But I don't know what happened
13  when they went off camera. Mr. Thibault was taken off
14  camera for a few tests I believe. The audio sounded like
15  they were doing sobriety tests off camera.
16      Q.    Did you see the performance of any HGN tests
17  captured on the video reflecting the activities at the
18  station?
19      A.    Could you repeat that?
20      Q.    Sure. Did you see, when you reviewed the
21  station videotapes --
22      A.    Oh.
23      Q.    -- the administration of any HGN tests and if
24  so, at what time on the video footage did you see such
25  tests administered?

BUGBEE                                             Page 71

1      A.    At 12 -- excuse me. At 2:50 and 28 seconds
2  the HGN was given, again, in the booking room. It's the
3  second time it's given.
4      Q.    Was it given by Officer Wierszewski?
5      A.    Yes.
6      Q.    How much time elapsed between the one at the
7  traffic stop and this one in the booking; over an hour?
8      A.    The one at the traffic stop was at 1:58. The
9  one in the booking room was at 2:50. Less than an hour.
10      Q.    So about 50 minutes between the two?
11      A.    Roughly. 52 minutes.
12      Q.    You're not suggesting that the HGN performed
13  at the traffic stop fatigued Mr. Thibault's eyes with
14  respect to the second HGN performed 50 minutes later, are
15  you?
16      A.    No. I'm basing my conclusion merely on the
17  officer's statement.
18      Q.    What is it of the officer's statement that
19  you are basing your conclusion on?
20      A.    At 2:10 and 48 seconds another officer pulls
21  up. Potentially a senior officer or supervisor because
22  Mr. Officer Wierszewski felt the need to report to him
23  and he said, quote: He hit the curb. He can't do
24  some -- he can't do sobriety tests. He doesn't have HGN.
25  That's what I base the results on, his statement: He

BUGBEE                                             Page 72

1  doesn't have HGN to his counterpart.
2      Q.    What does that mean to you?
3      A.    That means that he didn't test positive for
4  horizontal gaze nystagmus.
5      Q.    So in your opinion that statement would
6  validate that there was no jerking eye movement during
7  the performance of that test in the horizontal plane.
8  Correct?
9      A.    I just take it on its face that it was a
10  negative test because the officer said so.
11      Q.    All right. Now anything else about the HGN?
12  I think you indicated you thought that it was improperly
13  provided. Have we covered all of your criticisms of the
14  administration of that test by Officer Wierszewski that
15  you believe were inappropriate?
16      A.    Those are my observations, however, I did
17  observe that during the test Mr. --
18      Q.    What page are you reading from your notes;
19  upper right corner.
20      A.    Yes. I know where the page number is. I'm
21  just reading.
22      Q.    Okay.
23      A.    I'm looking at page number five.
24      Q.    Okay. What on that page were you about to
25  tell me about during the test?

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                                    Page 73

1    A.   That is all.
2    Q.   That was it?
3    A.   That's all.
4    Q.   Any criticisms?
5    A.   I have no other observations.
6    Q.   I'm looking at the bottom of five and it
7   says: 33. I'm assuming that is Officer Wierszewski.
8   Turns on light and instructs defendant to watch light.
9   Tests done improperly. 33. Doing large circles. Three
10  eye crosses. Four circles. 11 horizontal deviations.
11  Extended max D beyond three seconds.
12          Is any of that critical of the
13  administration of the test?
14   A.   That's consistent with my observation that
15  mixing the lack of convergence with the HGN could fatigue
16  the eyes. It was never my practice to do that many
17  movements. Typically I would do it in three or four
18  quick movements.
19   Q.   I'm just trying to figure out what that
20  refers to when obviously that refers to your very first
21  criticism of the mixing of the two tests. Correct?
22   A.   That is documentation of the mixing of the
23  two tests.
24   Q.   Are you critical of any of the three
25  standardized field sobriety tests that we have already

BUGBEE                                                    Page 74

1   talked about that we haven't already discussed?
2    A.   Am I critical?
3    Q.   Any other criticisms I guess is what I'm
4   asking you other than what we have already discussed?
5    A.   I don't have criticisms other than I don't
6   believe they rose to the level of probable cause for an
7   arrest in and of themselves.
8    Q.   With respect to the performance of Officer
9   Wierszewski, as it relates to his arrest, am I correct
10  that your opinion is that he had no probable cause to
11  arrest him for OWI?
12   A.   Correct.
13   Q.   Any other opinions that you are going to
14  render against Officer Wierszewski in this case?
15          MR. RADNER: I'm going to object to
16       the form of that question.
17          You can answer it if you understood
18       it.
19   A.   I have no criticisms toward Officer
20  Wierszewski, other than he seemed to have ignored the
21  evidence that he was developing to make his arrest
22  decision.
23   Q.   Can you answer my question?
24   A.   No.
25   Q.   Okay.

BUGBEE                                                    Page 75

1    A.   No, I don't have any.
2    Q.   Okay.
3    A.   Yes, I can answer your question. The answer
4   is no.
5    Q.   That's fair enough.
6          What is it that you reviewed if anything
7   to render an opinion as it relates to the City of Grosse
8   Pointe Farms?
9          MR. RADNER: I'm going to object that
10      it calls for a legal conclusion but if you can
11      answer that question.
12   A.   I don't know what you're asking.
13   Q.   Early on in the deposition, Mr. Bugbee, I
14  asked if you were going to render opinions critical of
15  Officer Wierszewski and the City of Grosse Pointe Farms.
16  And my recollection is that you indicated an affirmative
17  response to both of those questions.
18          In so much as you have just indicated to
19  me that you have no other opinions related to Officer
20  Wierszewski, other than you believe he did not have probable
21  cause to arrest Mr. Thibault, I'm now moving to the City of
22  Grosse Pointe Farms to ascertain what opinions if any you
23  will be asserting before the Jury if allowed to do so in
24  this matter?
25   A.   I clearly misunderstood the scope of that

BUGBEE                                                    Page 76

1   question. No, I don't have any criticisms against the
2   City of Grosse Pointe Farms. I would like to correct
3   that prior statement. No, I do not have criticisms.
4    Q.   You know what, I'm going to let you do that.
5   Any other materials that you were kind enough to bring
6   that we haven't already marked?
7    A.   I have got my training certificates.
8    Q.   Let's mark those. Are those copies that you
9   made for me?
10   A.   These are copies of my training certificates.
11   Q.   Okay.
12          (Deposition Exhibit No. 9 marked for
13       identification.)
14   Q.   Are you prepared to render any opinions in
15  this matter against Officer Wierszewski related in any
16  fashion whatsoever to the dismissal of the misdemeanor
17  charges brought against him in January of 2015?
18          MR. RADNER: I'm going to object to
19       that because I'm not sure I understand that
20       question.
21   A.   I don't understand.
22          MR. DEGROOD: Would you read it back
23       again?
24          (Record repeated.)
25   A.   Was Wierszewski charged.

1   Q.   No. Perhaps I misspoke. Are you in any
2   position to render any opinions against Officer
3   Wierszewski with respect to the dismissal of the
4   misdemeanor charges brought against Mr. Thibault which
5   were dismissed in January of 2015?
6   A.   No.
7   Q.   Am I correct that you have no knowledge one
8   way or the other with respect to what role if any Officer
9   Wierszewski had in the dismissal of the misdemeanor
10  charges?
11  A.   You're correct.
12         MR. DEGROOD: Let's go off the
13     record.
14        (Brief recess.)
15  Q.   Mr. Bugbee, are you at this point in time
16  rendering any opinion related to Officer Wierszewski
17  concerning the claims of malicious prosecution being made
18  against him?
19  A.   No.
20  Q.   I think you have already indicated that you
21  have no opinions related to the City of Grosse Pointe
22  Farms, correct?
23  A.   Correct.
24         MR. RADNER: Subject to my objection
25     to that question.

1   Q.   Have you at any point in time been provided
2   with a copy of the actual Complaint filed in United
3   States District Court against my clients?
4   A.   Yes.
5   Q.   Would you agree with the statement: That
6   every arrest of a citizen by a law enforcement officer
7   requires a judgment call be made on behalf of the
8   arresting law enforcement officer?
9   A.   Yes.
10         MR. RADNER: What do we want a copy
11     of here?
12        (Brief recess.)
13  Q.   Would you agree that at the time of this
14  particular stop by Officer Wierszewski that he was acting
15  in furtherance of a legitimate government function?
16  A.   Yes.
17  Q.   As a retired Michigan State Police officer,
18  you would agree that there were no violations of Mr.
19  Thibault's rights related to the actual stop of him that
20  evening?
21  A.   I would agree.
22  Q.   It was not a violation of Mr. Thibault's
23  rights on 12-5-14 to ask for his CDL or commercial
24  driver's license, logbook, medical card or annual
25  inspection forms when he was stopped?

1   A.   Correct.
2   Q.   It was not a violation of any of Mr.
3   Thibault's rights on 12-5-14 when Officer Wierszewski
4   asked him if he was suffering from any medical issues?
5   A.   Correct.
6   Q.   Would you also agree that it was not a
7   violation of Mr. Thibault's rights when Officer
8   Wierszewski asked him at what time he had started driving
9   that evening?
10  A.   Correct.
11  Q.   Would you also agree that it was not a
12  violation of Mr. Thibault's rights when Officer
13  Wierszewski asked him to explain what had happened with
14  respect to his vehicle coming into contact with the
15  island median?
16  A.   Correct.
17  Q.   Would you agree that it was not a violation
18  of Mr. Thibault's rights for Officer Wierszewski to ask
19  him if he had had anything to drink that evening?
20  A.   Correct.
21  Q.   Would you also agree that it was not a
22  violation of Mr. Thibault's rights for Officer
23  Wierszewski to ask Mr. Thibault to participate in the
24  standard field sobriety test and field sobriety test that
25  evening?

1   A.   Correct.
2   Q.   Would you agree that it was not a violation
3   of Mr. Thibault's rights for Officer Wierszewski to frisk
4   him the evening he was stopped on 12-5 --
5   A.   Correct.
6   Q.   -- '14.
7   A.   Correct.
8   Q.   And would you agree that Mr. Thibault
9   voluntarily consented to allow the officers to search his
10  semi tractor the evening of 12-5 --
11         MR. RADNER: I'm going to object to
12     that.
13  Q.   -- '14.
14         MR. RADNER: You can answer it if you
15     can.
16  A.   I don't recall if a full and willing waiver
17  of that. I think he --
18  Q.   Do you recall the question being asked of Mr.
19  Thibault?
20  A.   I think it went something to the effect of:
21  You don't mind if I look in your car, do you?
22         And Mr. Thibault said no. So I don't
23  know if that's a --
24  Q.   It was not inappropriate for Officer
25  Wierszewski to ask Mr. Thibault, prior to the

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                                    Page 81

1 administration of any standard field sobriety test or
2 field sobriety test, whether he, Mr. Thibault, had any
3 problems or difficulties with standing, sitting or
4 walking?
5      A.   No.
6      Q.   Did you see any evidence in any of the
7 materials that were provided to you or procured by you
8 that demonstrate Mr. Thibault ever telling Officer
9 Wierszewski or any other officers who came into contact
10 with him on December 5th, 2014, that he, Mr. Thibault,
11 had a speech impediment?
12     A.   No.  He did say he is slow though at one
13 point.  I don't know what that means.
14     Q.   He also indicated in response to questions
15 that he did not have any physical problems and was not
16 under a doctor's care, correct?
17     A.   Yes.  He at one point said he was receiving
18 doctor's care from V.A.  That was never pursued.
19     Q.   Where was that?  You can refer to your notes.
20          (Brief recess.)
21          MR. DEGROOD: Back on the record.
22     Q.   In case Mr. Bugbee has a response to the last
23 question.
24          MR. RADNER: Please identify which
25     page number of Exhibit 7 you are looking at.

BUGBEE                                                    Page 82

1      A.   I will do that.  When he was being given the
2 blood pressure test -- let's see.  I'm sorry.  I can't
3 find exactly where it said but when he was given the
4 blood pressure test he said something to the effect of:
5 I have this done once a month.  But right now I can't
6 find it in here.
7      Q.   All right.  In your experience is there any
8 margin of error related to the standard field sobriety
9 tests?
10     A.   If there is I wouldn't know what it is.
11     Q.   Would you know if it, that margin of error,
12 is any different for a, quote, war combat veteran,
13 unquote?
14     A.   I wouldn't know that.
15     Q.   Have you ever heard that at any time in your
16 experience?
17     A.   I have never heard that.
18     Q.   Because I'm winding down, I'm going to ask
19 one more time.  Any other opinions that you will be
20 rendering that are critical -- and by critical I mean
21 demonstrative of a deviation from the standards expected
22 of a reasonable and prudent public safety officer as they
23 existed on December 5th, 2014, under the circumstances of
24 this case related to Officer Wierszewski that we have not
25 already covered?

BUGBEE                                                    Page 83

1      A.   Well, from my observations I believe that the
2 amount of tests given and the repetitive tests was very
3 excessive.  I tested for navy pilot and I took the
4 physical and I didn't go through this much to do that.
5          So I think it was rather excessive and I
6 think that Officer Wierszewski ignored the evidence that he
7 collected all along the way to make his decision.  It just
8 appeared to be a results based investigation.
9      Q.   You didn't perform any physical exams on any
10 Air Force pilot, did you?
11     A.   I was an Air Force OSI agent.
12     Q.   Pardon me?
13     A.   I was an Air Force OSI agent.  We weren't
14 allowed to do that.
15     Q.   What are you referring to when you just said:
16 I gave the test to a pilot?
17     A.   No.  I said I took the test for Navy pilot.
18     Q.   All right.
19     A.   And I went through quite extensive flight
20 physicals and stuff.  I was flabbergasted by how much he
21 was putting this person through to try to get a positive
22 result.
23     Q.   You mean to tell me, to get a seat in one of
24 the United States Navy's aircraft you go through less
25 than two to three hours testing overall?

BUGBEE                                                    Page 84

1      A.   I don't recall officially what was contained
2 in the test and what -- how long the duration was.
3      Q.   How old were you?
4      A.   I was 19.
5      Q.   Were you a member of the United States Navy?
6      A.   I was a Midshipman at University of Michigan.
7      Q.   So you were on the ROTC program?
8      A.   I was in the Naval ROTC program.
9      Q.   Upon graduation did you serve in the Navy?
10     A.   No.  Upon graduation I -- actually I
11 entered -- prior to graduation I entered the Air National
12 Guard.  I went from there to the Air Force Reserves where
13 I was a Air Force Offices Special Investigations, Special
14 Agent and reserve status.
15     Q.   Do you receive a pension from the Reserves?
16     A.   No.
17     Q.   Are you still a reservist?
18     A.   No.
19     Q.   When is the last time you participated as an
20 Air Force reservist?
21     A.   I retired from the Air Force Reserve in 2010,
22 20 years.  And I will begin to receive a pension at the
23 age of 59.
24          MR. DEGROOD: Thank you.  I have
25     nothing further.

Alan Thibault v.
Edward Wierszewski

Marty Bugbee
February 23, 2016

BUGBEE                                    Page 85

1          MR. RADNER: Two questions.
2          E X A M I N A T I O N
3    BY MR. RADNER:
4       Q.   Can you please turn to page 14 of Exhibit 7.
5    And please tell me if that refreshes your recollection as
6    to where in Exhibit 7 and where in the video there is
7    discussion of treatment at a VA.
8       A.   Okay.  Yes.
9          MR. DEGROOD: What page are we on?
10      A.   That's on page No. 14.  At 2:47 and 05
11   seconds Officer Wierszewski asked him:  Do you have any
12   physical defects?
13          Mr. Thibault responds, quote:  A little
14   slow.
15          There's no pursuit of that by Officer
16   Wierszewski.
17          He goes on to the next question:  Are
18   you under the care of a doctor or dentist is what
19   Wierszewski asked next.
20          Thibault answers:  VA.
21          Still no pursuit of what for or
22   anything.
23      Q.   One last question.  If you can turn to page
24   No. 11.  This is just for reference.  There was something
25   that you said to me about:  Inner air 92 bravo infantry.

BUGBEE                                    Page 86

1    Something about that that you thought peaked your
2    interest.
3          Can you explain that, please.
4       A.   During conversation with 92 bravo, there was
5    at 2:12:55, an unknown officer asked:  What's your MOS.
6    Mr. Wierszewski or -- excuse me -- Mr. Thibault says,
7    quote:  92 bravo, which I believe is a combat position.
8          When he is engaged in conversation,
9    again later in the booking room, he tells another -- or I
10   think it was Veronica.  I think that's Officer Cashion --
11   that he was in infantry in the military.  She engaged him in
12   cordial conversation.
13          This was at 3:53 and 30 seconds Veronica
14   takes his fingerprints.  He is very cooperative.  Follows
15   instructions.  He is coordinated.  Steady stance.  No
16   assistance needed standing.  Veronica engages Mr. Thibault
17   in conversation about his job and the military.
18          I believe at that point is when he tells
19   her he was in the infantry.  This is -- what I have got
20   written down here is a summary of the situation and not
21   direct quotes because the conversation went on for a bit.
22   He talks about his trucking job.  He talks about the
23   military.  Says he's in infantry.  All the time very cordial
24   and polite.
25      Q.   Is there any significance to that with how

BUGBEE                                    Page 87

1    you would administer these field sobriety tests?
2       A.   Oh, I would pursue whether or not they have
3    been subject to any kind of a concussion from loud
4    explosions or gun fire.  I would be concerned about their
5    inner ear and the condition of it.  Balance tests are all
6    about the inner ear's capability to balance the body.
7          MR. RADNER: Nothing further.
8          MR. DEGROOD: Thank you, sir.
9          (Deposition concluded at 1:10 p.m.)
10             *    *    *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BUGBEE                                    Page 88

1          CERTIFICATE OF NOTARY PUBLIC
2    State of Michigan )
3    County of Oakland )    SS.
4          I, the undersigned, do hereby certify that the
5    witness, whose attached testimony was taken before me in
6    the above-entitled matter, was by me first duly sworn to
7    to testify to the truth; that the testimony contained
8    herein was by me reduced to writing in the presence
9    of the witness by means of stenography; afterwards
10   transcribed; and that this is a true and complete
11   transcript of the testimony given by the witness.
12          I do further certify that I am not
13   connected by blood or marriage with any of the parties;
14   their attorneys or agents; that I am not an employee
15   of either of them; and that I am not interested, directly
16   or indirectly, in the matter in controversy.
17          In witness whereof  I have hereunto set my
18   hand.   *Nikki Hatz Sinta*
19
20          Nikki Hatz Sinta, CSR-2377
21          Certified Shorthand Reporter
22          Notary Public, Oakland County
23          My Commission Expires: 12-09-19
24
25