UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALAN THIBAULT,

       Plaintiff,                           Case No. 15-cv-11358
                                             Hon. Matthew F. Leitman

v.

EDWARD WIERSZEWSKI,

       Defendant.

_____/

**OPINION AND ORDER (1) GRANTING IN PART AND DENYING IN
PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF #12)
AND (2) DENYING DEFENDANT'S MOTION TO EXCLUDE EXPERT
TESTIMONY (ECF #13)**

On December 5, 2014, Defendant Edward Wierszewski ("Wierszewski"), a

public safety officer with the City of Grosse Pointe Farms, arrested Plaintiff Alan

Thibault ("Thibault") for operating a motor vehicle while under the influence of

drugs.  Blood tests later revealed that Thibault did not have any medications or

controlled substances in his system, and a prosecutor dismissed the criminal

citation that Wierszewski had issued to Thibault.  In this action, Thibault alleges

that Wierszewski violated the Fourth Amendment by arresting him without

probable cause and by maliciously prosecuting him.

Wierszewski now moves for summary judgment on his qualified immunity

defense (the "Summary Judgment Motion"). (*See* ECF #12.)  Wierszewski argues

that he is entitled to such immunity because he reasonably believed that Thibault had been driving while under the influence of drugs and was thus subject to a lawful arrest and prosecution. Wierszewski would be correct *if* the facts were as he describes them. But many of the key facts here are hotly disputed. And if a jury resolved those disputes in Thibault's favor, it could find that Wierszewski's mistaken conclusion that he had probable cause to arrest Thibault was not a reasonable one. Accordingly, Wierszewski is not entitled to summary judgment on his qualified immunity defense to Thibault's unlawful arrest claim.

However, Wierszewski is entitled to summary judgment on Thibault's malicious prosecution claim. That claim fails as a matter of law because Thibault has failed to present any evidence that he suffered a deprivation of liberty apart from his initial arrest.

In a second motion, Wierszewski seeks to exclude the testimony of Thibault's retained expert witness Marty Bugbee ("Bugbee") (the "Motion to Exclude"). (*See* ECF #13.) As explained below, the Court concludes that exclusion is not warranted.

Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** the Summary Judgment Motion and **DENIES** the Motion to Exclude.

2

# I

## A

On December 5, 2014, Wierszewski was on patrol in the early morning hours when he "observed the front tire . . . of [a] semi tractor-trailer hit, go up and over and bounce off [a] median [on Moross Road], while it was being operated in a straight line on [a] stretch of straight roadway." (Wierszewski Aff. at ¶ 17, ECF #12-2 at 6, Pg. ID 113.)  Wierszewski believed that the driving he observed was "erratic," and he thereafter began to follow the truck in his squad car. (*Id.*)  While following the truck, he noticed that it had at least two equipment violations. (*See id.*)  Wierszewski then initiated a traffic stop.

Thibault was driving the semi-truck.  He had been on his way to make a delivery to a local Wendy's when he came into contact with the median. (*See* Thibault Dep. at 67, ECF #12-7 at 19, Pg. ID 242.)  Thibault explained to Wierszewski that he had gotten lost, was "trying to make [a] turn," saw a "split" in the roadway, and "jerked over a little bit" into the curb and median in order to avoid encountering oncoming traffic. (Traffic Stop Tr. at 3, ECF #12-5 at 4, Pg. ID 189.)

Wierszewski claims that as he observed Thibault, he noticed a number of unusual circumstances that led him to suspect that Thibault may have been under the influence of alcohol or drugs.  For example, Wierszewski says that Thibault's

3

window had been rolled down even though it was a cold morning, that Thibault's car stereo was "extremely loud," that Thibault was "smoking/puffing on an unlit cigarette," and that Thibault's "face was flushed and red." (Wierszewski Aff. at ¶ 19, ECF #12-2 at 7-8, Pg. ID 114-15.) Wierszewski also says that Thibault "appeared disoriented and spoke with slow speech."[1] (*Id.* at ¶ 19, ECF #12-2 at 8, Pg. ID 115.) Wierszewski adds that as Thibault exited his truck, Thibault "tried to extinguish" the unlit cigarette. (*Id.*; *see also* Police Report, ECF #12-2 at 28, Pg. ID 135.) Finally, Wierszewski says that Thibault "was shaking, in spite of the fact that he had just exited a warm semi-tractor cab." (*See* Wierszewski Aff. at ¶ 20, ECF #12-2 at 8, Pg. ID 115.)

Wierszewski repeatedly asked Thibault if he (Thibault) had consumed any alcohol or drugs that would affect his ability to drive, and Thibault continually denied doing so. (*See* Traffic Stop Tr. at 3-5, 15-16, ECF #12-5 at 4-6, 16-17, Pg. ID 189-91, 201-02.) Wierszewski did not believe Thibault's denials and told Thibault that he must be "on something." (*Id.* at 15-16, ECF #12-5 at 16-17, Pg. ID 201-02.) Wierszewski also searched the cab of Thibault's truck for signs of drugs or alcohol, but Wierszewski found nothing. (*See id.* at 12-13, ECF #12-5 at 13-14, Pg. ID 198-99.)

---

[1] While Wierszewski says that Thibault's "slow" speech caused him to suspect that Thibault was intoxicated, Wierszewski acknowledges that Thibault did not have "slurred" speech. (Wierszewski Dep. at 22, ECF #12-3 at 9, Pg. ID 156.)

4

In order to further assess Thibault's condition, Wierszewski administered a series of field sobriety tests.  Wierszewski says that he is certified in these tests and that he administered the tests in a manner that was consistent with his training. (*See, e.g.*, Wierszewski Dep. at 26-27, ECF #12-3 at 10, Pg. ID 157; *see also* Certifications, ECF #12-8.)  Three of the tests that Wierszewski administered – the "Walk and Turn Test," the "One-Leg Stand Test," and the Horizontal Gaze Nystagmus Test (the "HGN Test") – are "recommended" and "validated tests recognized by the [National Highway Traffic Safety Administration (the "NHTSA")]." (Wierszewski Aff. at ¶ 25, ECF #12-2 at 9, Pg. ID 116.)

Wierszewski acknowledges that Thibault successfully completed two of the field sobriety tests without exhibiting signs of impairment.  More specifically, Thibault completed (1) a test in which Wierszewski asked him to pick a number between 19 and 21 (the "Pick a Number Test") and (2) a test in which Thibault had to touch the tips of each of his fingers on his right hand with his thumb while counting out loud forwards and backwards (the "Finger Dexterity Test"). (*Id.* at ¶ 23, ECF #12-2 at 8-9, Pg. ID 115-16.)

However, Wierszewski says that Thibault exhibited multiple signs of intoxication during the other five tests, including the three NHTSA-recognized tests.  In the first of these tests, Wierszewski asked Thibault to recite the alphabet starting with the letter "d" and ending with the letter "o" (the "Alphabet Test").

5

(*See id.* at ¶ 23, ECF #12-2 at 9, Pg. ID 116.)  Wierszewski says Thibault started at "d" but then went back to "a" and recited the alphabet "past the letter o" where he was instructed to stop. (*Id.*)

In the second test, Wierszewski asked Thibault to close his eyes and re-open his eyes when he believed that thirty seconds had elapsed (the "30 Second Test"). Wierszewski says that Thibault did not complete this test properly because Thibault "counted the passage of 30 seconds in his mind as 19 seconds."  (*Id.*)

The third test that Wierszewski administered was the "Walk and Turn Test." Wierszewski says this test has two phases, an "instruction" phase and a "walking" phase. (*Id.* at ¶ 26, ECF #12-2 at 9, Pg. ID 116.)  According to Wierszewski, in the "instruction" phase, a person must "stand heel-to-toe with [his] arms at [his] sides, listening to and remembering the instructions." (*Id.* at ¶ 26, ECF #12-2 at 10, Pg. ID 117.)  Wierszewski says in the "walking" phase, a person must take nine "heel-to-toe steps on an imaginary straight line, turn around keeping the front or lead foot on the line and to turn by taking a series of small steps with the other foot, and return nine (9) heel-to-toe steps down the line, counting each step out loud." (*Id.* at ¶ 28, ECF #12-2 at 10, Pg. ID 117.)  In addition, the person must "keep his arms at his sides at all times" and "not stop walking until the test was completed." (*Id.*) Wierszewski says that Thibault exhibited multiple "clues" of intoxication during this test, including "extreme body rigidity," "sway[ing]," stopping, and

6

"attempt[ing] to maintain his balance using his arms. (*Id.* at ¶ 32, ECF #12-2 at 12, Pg. ID 119.)

The fourth test that Wierszewski administered was the "One-Leg Stand Test." During this test, Wierszewski instructed Thibault to "raise either leg approximately six inches off the ground with that leg held straight out with the other leg straight as well." (*Id.* at ¶ 34, ECF #12-2 at 13, Pg. ID 120.) Wierszewski also directed Thibault to "look at [his] elevated foot during the test" and count out loud until told to stop. (*Id.*) Wierszewski says that Thibault exhibited multiple clues of intoxication during this test. (*See id.*) Specifically, Wierszewski says Thibault "did not count as instructed . . . could not maintain his elevated foot at a consistent height, swayed while balancing, and used his arms to balance." (*Id.* at ¶ 36, ECF #12-2 at 13-14, Pg. ID 120-21.) Wierszewski says Thibault also "hopped [on] one occasion." (*Id.*)

The final test that Wierszewski administered was the HGN Test. (*See id.* at ¶ 37, ECF #12-2 at 14, Pg. ID 121.) During this test, Wierszewski asked Thibault to focus on a stimulus (in this case, a blue light) that Wierszewski moved from side to side in front of Thibault's face. (*See id.*) Wierszewski says that during this test, Thibault "demonstrated a lack of smooth pursuit" in both eyes and the presence of "nystagmus." (*Id.* at ¶ 38, ECF #12-2 at 15, Pg. ID 122.) Wierszewski insists that these were additional "clues" that Thibault was intoxicated. (*See id.*)

7

After Wierszewski completed the HGN Test, he asked Thibault to perform the Walk and Turn Test for a second time. (*See id.* at ¶ 33, ECF #12-2 at 12, Pg. ID 119.)   During this second Walk and Turn Test, Wierszewski says he again observed numerous "clues" of intoxication, including Thibault using "his arms in an effort to maintain his balance on multiple occasions." (*Id.*)

Wierszewski says that based on his interactions with, and observations of, Thibault, as well as the "clues" of intoxication Thibault exhibited during the field sobriety tests, he (Wierszewski) concluded that there was "probable cause [] to arrest [Thibault] for impaired operation of a motor vehicle." (*Id.* at ¶ 42, ECF #12-2 at 16, Pg. ID 123.)  He then arrested Thibault for that crime.

Wierszewski then transported Thibault to the police station for processing. When Thibault arrived at the station, he took a breathalyzer test.   That test registered no presence of alcohol. (*See* Wierszewski Dep. at 46, ECF #12-3 at 15, Pg. ID 162.)   Thibault also agreed to permit the police to test his blood, and Wierszewski accompanied Thibault to Cottage Hospital where Thibault's blood was drawn. (*See* Wierszewski Aff. at ¶ 41, ECF #12-2 at 16, Pg. ID 123.)  The blood was sent to the State Police lab for testing, and the results of the tests were not immediately available.  Nonetheless, Wierszewski issued Thibault citation for operating a motor vehicle while impaired. (*See* Citation, ECF #12-13 at 6, Pg. ID 292.)

**B**

Wierszewski's version of the stop and arrest is not undisputed. Indeed, the record contains evidence that calls into question many of the observations Wierszewski claims to have made during the stop and/or that undermines the significance of those observations:

| OBSERVATION WIERSZEWSKI CLAIMS TO HAVE MADE IN SUPPORT OF HIS CONCLUSION THAT THIBAULT WAS IMPAIRED | CONTRARY/COMPETING EVIDENCE IN THE RECORD |
| --- | --- |
| **Radio volume was unusually high** | • Thibault testified that the radio was "not that loud." (Thibault Dep. at 75, ECF #12-7 at 21, Pg. ID 244.) |
| **Thibault attempted to extinguish an unlit cigarette that was in his mouth** | • Thibault denies that he "attempt[ed] to extinguish an unlit cigarette." (Thibault Aff. at ¶ 2, ECF #27 at 1, Pg. ID 741.) |
| **Thibault was flushed and red in the face and shaking when he got out of his car** | • Thibault explained that he was shaking because he was not wearing a coat and "i[t] was cold out. It was really extremely cold outside." (Thibault Dep. at 87-88, ECF #12-7 at 24, Pg. ID 247.)<br><br>• Moreover, Thibault told Wierszewski that the reason he was shaking was because he was cold. (*See id.*; *see also* Stop Tr. at 4, ECF #12-5 at 5, Pg. ID 190.)<br><br>• Wierszewski acknowledged that it was "very cold" at the time of the stop and that the cold "could" explain Thibault's flushed face. (Wierszewski Dep. at 23, ECF #12-3 at 9, Pg. ID 156.) |

9

| Thibault appeared "disoriented" and spoke with "slow" speech | • The video and audio recording of the stop do not reveal any obviously slow speech nor other clear signs of disorientation. (*See* Recording, Exhibit 1 to ECF #12-2.)[2] |
|---|---|
| Thibault lost his balance momentarily during the Walk and Turn and One-Leg Stand Tests | • The video reveals that Thibault was able to walk steadily over uneven terrain as he traveled from cab of his truck to the front of Wierszewski's vehicle. (*See id.*) |

Moreover, other evidence in the record undermines the reliability of (1) the field sobriety tests administered by Wierszewski and (2) Wierszewski's interpretation of Thibault's performance on those tests. For instance, Thibault's proffered expert witness, former Michigan State Trooper Marty Bugbee, opined, based upon his review of a video recording of the stop, that Wierszewski did not properly administer four of the field sobriety tests.[3]

Bugbee testified that when Wierszewski administered the 30 Second Test, Wierszewski erroneously asked Thibault to count the passage of time silently, in his head. (*See* Bugbee Dep. at 66, ECF #13-3 at 19, Pg. ID 448.) Bugbee further testified that Wierszewski gave confusing instructions during the Alphabet Test. (*See id.* at 65, ECF #13-3 at 19, Pg. ID 448.) Bugbee also testified that Wierszewski improperly combined the HGN Test with another eye test known as the Lack of Convergence test. Bugbee explained that when these tests are

---

[2] The recording was filed in the traditional manner as Exhibit 1 to Wierszewski's Affidavit. The affidavit can be found in the record at ECF #12-2, and the page in the record that corresponds to the recording is Pg. ID 129.

[3] Wierszewski challenges the admissibility of Bugbee's testimony in the Motion to Exclude. But for the reasons stated below, the Court denies that motion.

combined, they fatigue the eyes and lead to false positives and inaccurate results. (*See id.* at 68, ECF #13-3 at Pg. ID 448.)   Finally, Bugbee opined that when Wierszewski administered the One-Leg Stand Test, Wierszewski erred by repeatedly asking Thibault to lift his leg higher and higher and by failing to observe Thibault throughout the entire test. (*See id.* at 60-61, ECF #13-3 at 17-18, Pg. ID 446-47.)

In addition, Bugbee testified that Thibualt "passed" the Alphabet Test and the One-Leg Stand Test.   Bugbee explained that "although [Thiabault] did the [Alphabet Test] improperly, he did it with clear speech.   He wasn't confused. Although he did it wrong . . . [t]he letters were said in sequence. . . . He maintained a steady position of balance throughout the test." (*Id.* at 65, ECF #13-3 at 19, Pg. ID 448.)   Bugbee said that in light of these facts, he would not have interpreted Thibault's performance as a "failed test." (*Id.*)   Bugbee further disputed Wierszewski's interpretation of Thibault's performance on the One-Leg Stand Test.   Bugbee testified that during that test, Thibault followed instructions without confusion and without difficulty, spoke with "no slurred speech as he was speaking and counting," and "complete[d] the test without putting his foot to the ground." (*Id.* at 61, ECF #13-3 at 18, Pg. ID 447.)

Finally, Thibault offered testimony that explained his difficulty keeping his balance at certain points during the field sobriety tests.   He explained that he has

had a longstanding problem with his balance (going back to the beginning of his time in the armed forces) and that this problem hindered his ability to complete successfully the Walk and Turn Test and the One-Leg Stand Test. (*See* Thibault Dep. at 86, 109-110, ECF #12-7 at 24, 30, Pg. ID 247, 253.) Thibault also testified that he told Wierszewski during the traffic stop that he had problems with his balance. (*See id.*) [4]

## C

At the beginning of the traffic stop, Wierszewski activated a video and audio recording system that was equipped in his squad car. The system continued to record until the end of the stop. Much of the interaction between Wierszewski and Thibault is captured on that video and audio recording. (*See* Recording, filed in the traditional manner as Exhibit 1 to ECF #12-2.) But material portions of the stop cannot be seen or heard on the recording. For example, the initial interaction between Wierszewski and Thibault – during which, according to Wierszewski, Thibault attempted to extinguish an unlit cigarette – cannot be seen on the video. Likewise, the video of the Walk and Turn Test does not depict Thibault's feet or the "line" he was supposed to walk, nor does it show how Thibault's eyes reacted

---

[4] The transcript of the traffic stop in the record does not contain any evidence that confirms Thibault's testimony that he informed Wierszewski that he had a problem with his balance. However, there are numerous parts of the transcript in which Thibault's responses are transcribed as "inaudible." (*See, e.g.*, Stop Tr. at 2, 11, 15, 16, 21, ECF #12-5 at 3, 12, 16, Pg. ID 188, 197 201, 202, 207.)

during the HGN Test.   Moreover, at several points on the recording, it is impossible to hear Thibault's response to Wierszewski's questions.   Because the recording does not capture all of the relevant aspects of the entire encounter between Thibault and Wierszewski, it does not provide a conclusive picture of precisely what occurred.

### D

After Thibault was formally charged with driving while impaired, he posted a $500 bond and was released from custody.   Immediately upon his release, Thibault reported to his employer and underwent drug and alcohol testing from his employer's drug testing facility.   Those tests came back negative for alcohol, marijuana, cocaine, amphetamines, opiates, and PCP. (*See* ECF #12-13 at 34-35, Pg. ID 320-21.)

On December 19, 2014, the police received the first set of results from the blood tests they had administered to Thibault. (*See* ECF #12-11.)   Those results confirmed that Thibault did not have any alcohol in his system on the night he was arrested. (*See id.*)   The prosecutor then entered into a stipulated order dismissing the driving while impaired charge without prejudice. (*See* ECF #12-13 at 18, Pg. ID 304.)   Following the dismissal of the charge, the police received a second set of results from the testing of Thibault's blood.   Those results came back negative for

13

the presence of other drugs, including amphetamines, opiates, cocaine, and barbiturates. (*See* ECF #12-12.)

On April 14, 2015, Thibault filed this action against Wierszewski under 42 U.S.C. § 1983. (*See* Compl., ECF #1.)  He alleges that Wierszewski violated his Fourth Amendment rights in two respects: by arresting him without probable cause and by maliciously prosecuting him. (*See id.*)  Wierszewski has asserted, among other defenses, the defense of qualified immunity.

Wierszewski filed the Summary Judgment Motion and the Motion to Exclude on March 29, 2016. (*See* ECF ## 12, 13.)  The Court held a hearing on both motions on June 6, 2016.

### III

Wierszewski argues that he is entitled to summary judgment on his qualified immunity defense.  The summary judgment standard and its application in the qualified immunity context are well-established.

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact . . . ."  *SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 326-27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor."  *Id.*   "The mere existence of a

14

scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." *Green v. Throckmorton*, 681 F.3d 853, 864 (6th Cir. 2012) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Once raised, it is the plaintiff's burden to show that the defendant[] [is] not entitled to qualified immunity." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

The Sixth Circuit "has generally used a two-step [qualified immunity] analysis: (1) viewing the facts in the light most favorable to the plaintiff, [the court] determines whether the allegations give rise to a constitutional violation; and (2) [the court] assesses whether the right was clearly established at the time of the incident." *Id.* (internal punctuation omitted).  "[U]nder either prong [of this inquiry], courts may not resolve genuine disputes of fact in favor of the party

15

seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). Indeed, in *Tolan*, the Supreme Court vacated a grant of summary judgment on a qualified immunity defense because, among other things, the lower court "credited the evidence of the party seeking summary judgment and failed to properly acknowledge key evidence offered by the party opposing that motion." *Id.* at 1867–68. The Supreme Court explained that "[b]y weighing the evidence and reaching factual inferences contrary to [the non-moving party's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party." *Id.* at 1867. Simply put, "where the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Green*, 681 F.3d at 864.

## IV

### A

"An officer has probable cause [to arrest] when the facts and circumstances known to the officer warrant a prudent man in believing that an offense has been committed." *Miller v. Sanilac County*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Henry v. United States*, 361 U.S. 98, 102 (1959)). "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Green*, 681 F.3d at 865 (quoting *Parsons v.*

16

*City of Pontiac,* 533 F.3d 492, 501 (6th Cir. 2008). "But a lack of probable cause is not necessarily fatal to an officer's defense against civil liability for false arrest. Rather, an officer is entitled to qualified immunity under § 1983 if he or she could reasonably (even if erroneously) have believed the arrest was lawful, in light of clearly established law and the information possessed at the time." *Id.* (internal quotation marks omitted). Here, Wierszewski is not entitled to summary judgment on his qualified immunity defense to Thibault's arrest-without-probable-cause claim because (1) there are important factual disputes concerning the basis for the arrest and (2) if a jury resolved those disputes in Thibault's favor, it could find that Wierszewski lacked a reasonable basis to believe that the arrest was lawful.

**B**

The conflicting evidence concerning what occurred in connection with the stop and arrest is set forth above. When the conflicts are resolved in Thibault's favor and when the evidence is otherwise viewed in the light most favorable to Thibault, the facts are as follows:

- Wierszewski stopped Thibault after the front tire of Thibault's semi tractor-trailer came into contact with a curb and median;
- Thibault's window was rolled down even though the weather was very cold;
- Thibault informed Wierszewski that he had not been drinking and had not taken any other drugs or substances;

17

- Wierszewski did not detect any odor of intoxicants from Thibault or his truck;

- Wierszewski did not find any drugs or intoxicants during a search of Thibault's truck;

- Thibault's radio was on, but the volume of the music was not unusually loud;

- Thibault had an unlit cigarette in his mouth;[5]

- Thibault never attempted to extinguish the unlit cigarette;

- Thibault was shaking and had a flushed face when he stepped out of his truck.  However, he was not wearing a sweater or jacket, and it was a very cold morning;

- Wierszewski administered seven different field sobriety tests;

- Thibault successfully completed the Pick a Number Test and the Finger Dexterity Test;

- Wierszewski did not properly administer four of the other five tests (the Alphabet Test, the 30 Second Test, the HGN Test, and the One-Leg Stand Test);

- There is no evidence in the record, other than Wierszewski's own testimony, that Thibault exhibited "clues" of intoxication during the HGN Test;

- Although Thibault exhibited some possible "clues" of intoxication during the Alphabet Test, the One-Leg Stand Test, and the Walk and Turn Test, he ultimately passed each of those tests;

---

[5] When Wierszewski asked Thibault about the unlit cigarette during the traffic stop, Thibault explained that it "goes out a lot."  (Stop Tr. at 3-4, ECF #12-5 at 4-5, Pg. ID 189-90.)  In addition, Thibault says he told Wierszewski that he knew the cigarette was not lit. (Thibault Dep. at 112, ECF #12-7 at 30, Pg. ID 253.)

18

- Thibault experienced a momentary, noticeable loss of balance during the Walk and Turn Test and the One-Leg Stand Test.  However, Thibault has had a longtime problem with balance, and he informed Wierszewski of this problem before taking the field sobriety tests;

- At certain points during the stop, Thibault was able to walk over uneven terrain without difficulty and without losing his balance; and

- Thibault did not speak in an unusually slow manner nor in a manner that suggested that he was disoriented.

The Sixth Circuit held on a similar set of facts in *Green*, *supra*, that an arresting officer was not entitled to summary judgment on his qualified immunity defense.  The plaintiff in *Green* had traveled all day from her hometown in South Carolina to a fairground in an unfamiliar area of Ohio. *See Green*, 681 F.3d at 856. At approximately 10:30 in the evening, the plaintiff drove to Walmart to purchase groceries.  As she returned to the fairgrounds, the roads "were wet from a recent rain [making] visibility somewhat worse than normal." *Id.*  In order to see better, the plaintiff turned on her high beam lights. However, the plaintiff failed to switch to her low beam lights when she encountered oncoming traffic.  Her failure to do so violated Ohio law.  A police officer driving in the opposite direction witnessed the plaintiff's failure to dim her lights, turned around, and began following her.  He then saw the plaintiff "briefly cross[] over a shoulder lane marker." *Id.*  The officer thereafter commenced a traffic stop.

19

After the officer approached the plaintiff's car, the officer asked why the plaintiff had "brighted" and "blinded" him with her high beams. *Id.* at 857. The plaintiff apologized and told the officer that she used the beams because it was dark, there were no street lights like there were in her hometown, and she was trying to drive carefully. *See id.* As the officer spoke with the plaintiff, he "momentarily pointed his flashlight inside [the plaintiff's] vehicle" and "noticed that [the plaintiff's] pupils were constricted." *Id.* He regarded that constriction as "abnormal." *Id.*

The plaintiff then tried to exit her car in order to retrieve her driver's license from her trunk. *See id.* When she did so, she "either forgot to completely remove her seatbelt or became entangled in it." *Id.* At that point, the officer "commented that [the plaintiff] might want to take her seatbelt off" when attempting to exit the vehicle. *Id.* (internal punctuation omitted). The plaintiff was then able "to remove her seatbelt quickly and easily," and she exited her vehicle. *Id.*

The officer then asked the plaintiff if she had anything to drink or had taken any drugs or medications that evening. *See id.* The plaintiff said she had not. *See id.* In addition, the officer "did not see or smell alcohol or drugs at any time during the stop," and he did not "notice anything suspicious" upon a preliminary search of the plaintiff's car. *Id.*

The officer nonetheless chose to administer several field sobriety tests.  He first attempted to conduct the HGN Test using his pen as a stimulus. *See id.* at 858. According to the officer, he tried to administer this test two times but was unable to complete the test because the plaintiff could not follow the tip of his pen as he moved it back and forth. *See id.*  The officer then asked the plaintiff again if she had taken any drugs or medications. *See id.*  The plaintiff said she had only been drinking water.  *See id.*  The officer did not believe her and insisted that "[y]ou've taken something else.  I mean, you're, you're just completely dazed off there for a second." *Id.*  The officer then tried to administer the HGN Test a third time, and he concluded that plaintiff again failed to follow the pen with her eyes. *See id.*

The officer then asked the plaintiff to "recite the alphabet, beginning with the letter L and ending with the letter S." *Id.*  He also asked her to "count backward from 57 to 42." *Id.*  The plaintiff was able to complete the Alphabet Test "without difficulty," but she "hesitated slightly between a few of the numbers" during the counting test. *Id.*  The officer also "noticed that she talked slowly and that there was a slight slur to her words." *Id.*  However, the sound recording on the video of the stop did "not indicate that [the plaintiff's] speech was either unusually slow or slurred." *Id.*

Next, the officer administered the One-Leg Stand Test. *See id.*  During the test, the plaintiff "struggled to maintain her balance . . . but [she] did not sway

21

badly." *Id.*  In addition, "[h]er foot appear[ed] to touch the ground on multiple occasions, and she skipped the number 19 while counting." *Id.*

Finally, the officer administered the Walk and Turn Test. *See id.*  During this test, the plaintiff "swayed very slightly as she walked, used her arms for balance, and turned right instead of left." *Id.* at 859.

After these tests were complete, the officer once more attempted to administer the HGN Test. *See id.*  When he again determined that the plaintiff could not follow his pen with her eyes, he arrested her for "driving under the influence of alcohol or drugs." *Id.*  Following her arrest, officers searched her car and found no evidence of drugs or alcohol. *See id.*

The plaintiff was then transported to the police station and charged with operating a motor vehicle while under the influence of drugs or alcohol.  She was held in custody for two days while she attempted to make bail. *See id.*

During her time in custody, the plaintiff provided a urine sample to be tested for alcohol and drugs.  "When [the plaintiff's] urine test later came back negative for both alcohol and drugs, all charges against her were dismissed." *Id.*

Following the dismissal of the charges against her, the plaintiff sued the officer under 42 U.S.C. § 1983 for, among other things, arresting her without probable cause. *See id.*  The officer moved for summary judgment on the basis of qualified immunity.  "The district court, after concluding that no constitutional

22

violations had occurred, granted summary judgment in favor of [the defendant officer]." *Id.* The Sixth Circuit reversed.

The Sixth Circuit first refused to treat as undisputed the officer's testimony that the plaintiff's "pupils were constricted and that this feature suggested possible impairment." *Id.* at 862. The court noted that the video of the stop "provide[d] no evidence to support [the officer's] claim that [the plaintiff's] pupils were constricted at the time of the stop," and it stressed that the negative result of the urine test "alone is sufficient to cast doubt on the truthfulness of [the officer's] testimony regarding [the plaintiff's] pupils." *Id.* at 862-63. The court added that under these circumstances, it was unwilling to "take" the officer's testimony about the plaintiff's pupils "on faith," and it declined to "penalize [the plaintiff] for failing to produce any evidence directly rebutting [the officer's] stated observation" concerning her pupils because she could not "speak to the appearance of her [own] pupils." *Id.*

The Sixth Circuit then stressed that a reasonable juror could conclude that the plaintiff was neither confused nor disoriented on the video of the stop:

> A reasonable jury could find, for example, that [the plaintiff] acted rationally throughout the stop, that her relatively minor traffic violations were not indicative of impairment, and that [the officer's] fabricated the alleged constriction of [the plaintiff's] pupils to create an after-the-fact justification for the detention.

*Id.* at 864.

Finally, after reviewing the video recording of the stop, the court was "convinced that [the plaintiff's] performance on the [field sobriety] tests was sufficiently ambiguous to submit the probable-cause question to the jury." *Id.* at 865. As the court explained:

> [The plaintiff] completed several of the tests without any apparent difficulty and others with only minor mistakes. And the video does not show whether she could follow the pen with her eyes when [the defendant] tried to administer the HGN test. Because reasonable jurors could interpret the video evidence differently, we conclude that the district court erred in deciding as a matter of law that [the defendant] had probable cause to arrest [the plaintiff].   We further conclude that the question of qualified immunity turns on disputed facts – namely, on [the plaintiff's] ambiguous performance on the field sobriety tests and whether [the defendant] was being truthful when he claimed that [the plaintiff] could not follow the pen – and thus the jury, not the judge must determine liability.

*Id.* at 865-66 (internal quotation marks omitted).

While the facts in *Green* are not identical to those here, there are a number of significant similarities between the two cases.  In both cases, (1) the plaintiffs drove in an irregular manner; (2) the officers did not see or smell alcohol during the stop; (3) the drivers denied ingesting drugs or drinking alcohol; (4) the officers found no evidence of drugs or alcohol in the drivers' vehicles; (5) the recordings of the stops did not plainly support the officers' claims that the drivers were

24

disoriented or spoke with irregular speech;[6] and (6) while the video recordings of the field sobriety tests depicted some conduct by the drivers that could arguably be consistent with impairment, reasonable jurors in both cases could interpret the videos "differently," *Green*, 681 F.3d at 866 – *i.e.*, as not depicting the obvious signs of impairment claimed by the arresting officers. Finally, just as the urine test results in *Green* raised doubts about the credibility of the officer's testimony concerning the plaintiff's pupils, the blood test results here cast doubt on Wierszewski's claim that Thibault's eyes did not "smoothly pursue" the blue light that Wierszewski used to administer the HGN Test (which was not captured on the video).

And in at least two important respects, Thibault's position here is much stronger than that of the plaintiff in *Green*. First, Thibault has presented expert witnesses testimony – missing in *Green* – that creates doubt as to whether the arresting officer properly administered many of the field sobriety tests that led to his arrest. Second, the Sixth Circuit in *Green* refused to consider the plaintiff's explanations for the shortcomings in her field sobriety test performance – *i.e.*, that she was tired from driving all day, was overweight, and was distracted by passing

---

[6] Wierszewski's claim that he suspected Thibault was impaired because Thibault spoke too *slowly* is in some tension with Wierszewski's later-expressed view that Thibault was under the influence of an impairing substance that "sped up" Thibault's cognition and processing. (Stop Tr. at 12, ECF #12-5 at 13, Pg. ID 198.) A fact-finder could reasonably conclude that this tension undermines the credibility of Wierszewski's claimed observations and descriptions of Thibault.

25

traffic and the officer's radio – because she did not offer the explanations to the officer at the time of the tests. *See Green*, 681 F.3d at 865.   Here, however, Thibault testified that he *did* tell Wierszewski about his long-standing balance problems. (*See* Thibault Dep. at 86, 109-110, ECF #12-7 at 24, 30, Pg. ID 247, 253.)   Given the Sixth Circuit's holding in *Green* that a jury in that case could have found that the officer made an unreasonable decision to arrest, this Court must conclude that a jury here could likewise deem objectively unreasonable Wierszewski's determination that he had probable cause to arrest Thibault. Accordingly, Wierszewski is not entitled to summary judgment on his qualified immunity defense to Thibault's arrest-without-probable-cause claim.

## C

Wierszewski resists this conclusion on four primary grounds, but none carry the day.   First, in both his motion papers and at oral argument, Wierszewski repeatedly argued that the evidence of probable cause was "undisputed and indisputable." (Wierszewski Mot. Summ. J. at 20-21, ECF #12 at 30-31, Pg. ID 98-99.)   For instance, Wierszewski stressed that "the totality of the circumstances surrounding [Thibault's] arrest . . . are <u>conclusively</u> established by: [Wierszewski's own] sworn deposition and [Wierszewski's] affidavit['s] . . . official certification of [his] expertise in the administration of [field sobriety tests] and drug detection;

the sworn affidavits of [other police officers on the scene that night]," and the video of the arrest. (*Id.* at 20, ECF #12 at 30, Pg. ID 98; emphasis in original.)

However, as detailed above, the circumstances surrounding the stop and arrest are riddled with important factual disputes. Indeed, the list of evidence identified by Wierszewski is notable for what is fails to mention: Thibault's deposition testimony and version of events and the portions of the video that support Thibault's version of events. Wierszewski also ignores Bugbee's expert testimony that Wierszewski improperly administered many of the field sobriety tests and reached the wrong conclusions when interpreting Thibault's performance on those tests. Wierszewski's failure to accept as true the facts favorable to Thibault is directly contrary to the Supreme Court's instructions in *Tolan* and inconsistent with the Sixth Circuit's guidance in *Green*.

Second, Wierszewski argues that the "authenticated video and audio recording of Thibault's detention and arrest" leads to "the <u>unavoidable conclusion</u> that Officer Wierszewski made an <u>objectively reasonable</u> judgment call that there was probable cause to believe that Thibault was driving under the influence of intoxicants." (Wierszewski Mot. Summ. J. at 20-21, ECF #12 at 30-31, Pg. ID 98-99; emphasis in original.) But, as described above, the video in this case is ambiguous in many of the same ways that the video in *Green* was ambiguous, and portions of the video – *i.e.*, Thibault's steady walk from his truck to the front of

27

Wierszewski's squad car over uneven ground and the audio of his speech as he spoke with Wierszewski – affirmatively support Thibault's insistence that he did not appear impaired.  In addition, as further described above, the video recording does not capture the entire encounter between Wierszewski and Thibault, nor does the video capture (1) Thibault's feet during at least some of the field sobriety tests that involve his use of his feet or (2) his eyes during the HGN Test.  This is simply not a case like *Scott v. Harris*, 550 U.S. 372 (2007), in which a complete and unambiguous video recording "blatantly contradict[ed]" one party's version of events and was thus sufficient to resolve a qualified immunity defense as a matter of law.

Third, Wierszewski cites a long line of cases for the proposition that "[t]he results of standard or accepted field sobriety tests may provide reliable evidence of probable cause for an arrest for driving under the influence of intoxicants." (Wierszewski Mot. Summ. J. at 19, ECF #12 at 29, Pg. ID 97.)  But, as described above, there is evidence in this record that Wierszewski erroneously administered and interpreted the tests.  This evidence, if accepted by a jury, would materially undermine the reliability of the test results that Wierszewski seeks to rely upon.  Moreover, in all but one of the cases cited by Wierszewski, (1) the plaintiff

28

admitted to taking intoxicants and/or (2) the officer smelled intoxicants coming from the vehicle, and neither of those circumstances exist here.[7]

Fourth, Wierszewski argues that the Court should disregard Bugbee's testimony that Wierszewski improperly administered the field sobriety tests because Bugbee testified that Wierszewski administered the tests properly. This argument fails to account for the totality of Bugbee's testimony. As Wierszewski

---

[7] *See Bradley v. Reno*, 632 Fed. App'x 807, 808 (6th Cir. 2015) (the plaintiff's "breath smelled of alcohol" and when asked, the plaintiff "admitted that he had consumed a 'couple' 'small pitchers' of beer"); *Jolley v. Harvell*, 254 Fed. App'x 483, 484 (6th Cir. 2007) (officer asked plaintiff "to step outside to the rear of the car after allegedly smelling marijuana"); *Ketchum v. Kahn*, No. 10-14749, 2014 WL 35633437, at *1 (E.D. Mich. July 18, 2014) (officer "smelled a strong odor of intoxicants, and [the plaintiff] acknowledged that he had consumed a beer and was taking Lorazepam"); *Cameron v. Riverview*, No. 10-14098, 2011 WL 3511497, at *2 (E.D. Mich. July 26, 2011) (officers testified "they could smell the odor of intoxicants" and plaintiff "admitted to consuming a couple of alcoholic beverages"); *Freeland v. Simmons*, 2012 WL 258105, at *2 (D.S.C. Jan. 27, 2012) (officer testified that "he detected a strong odor of alcohol on [plaintiff's] breath" and plaintiff "admitted that he had 'had a few'"); *Rutherford v. Cannon*, 2010 WL 3475283, at *2 (D.S.C. Sept. 2, 2010) (officer "testified that he detected an odor of alcohol coming from plaintiff's car"); *Shackelford v. Gutermuth*, 2005 WL 3050522, at *1 (W.D. Ky. Nov. 10, 2005) (plaintiff admitted to have taken an unidentified medication "which she did not normally use"); *United States v. Gorder*, 726 F. Supp. 2d 1307, 1309 (D. Utah 2010) (officer testified he "noticed an alcoholic beverage odor"); *United States v. Hernandez-Gomez*, 2008 WL 1837255, at *2 (D. Nev. Apr. 22, 2008) (officer testified "he observed an odor of alcohol emanating from the defendant" and defendant admitted to drinking "two or three beers"). And the only case cited by Wierszewski in which the officer did not smell intoxicants and the plaintiff did not admit to consuming an intoxicant – *Mott v. Davis*, 2011 WL 4729856 (E.D. Tenn. Oct. 5, 2011) – is also distinguishable. In *Mott*, the plaintiff had "bloodshot" and "glazed-over eyes" and slurred his speech, important factors that did not exist here. *Id.* at *8. Moreover, *Mott* is an unpublished decision from another jurisdiction, and it was decided *before* the Sixth Circuit's published, binding decision in *Green*.

accurately notes, at one point during his deposition, Bugbee did testify that Wierszewski properly administered the Walk and Turn Test and the One-Leg Stand Test. (*See, e.g.*, Bugbee Dep. at 51, 59, ECF #13-13 at 15, 17 Pg. ID 444, 446.) However, at other points, Bugbee did criticize Wierszewski's administration of the One-Leg Stand Test. Bugbee opined that during that test Wierszewski improperly "stopped observing [] Thibault" and kept asking Thibault to lift his leg higher into "a difficult position for [] Thibault to maintain his balance." (*Id.* at 60-61, ECF #13-3 at 17-18, Pg. ID 446-47.) In addition, as detailed above, Bugbee also criticized Wierszewski's administration of several *other* tests, including the Alphabet Test and the HGN Test, one of the three recognized NHTSA field sobriety tests. Bugbee's testimony, when viewed in Thibault's favor, as it must be at this stage, creates a factual dispute as to whether Wierszewski properly administered the field sobriety tests.[8]

Finally, while the Court rejects Wierszewski's argument that he is entitled to judgment as a matter of law, the Court does appreciate "the difficulty inherent in making on-the-fly determinations regarding possible driving impairments, just as [it] recognize[s] the severity of drunk driving and the potential consequences of an incorrect call had [Thibault] ultimately proven to be impaired." *Green*, 681 F.3d at

---

[8] Wierszewski is certainly free to impeach Bugbee at trial with those portions of Bugbee's deposition testimony that arguably confirm that Wierszewski administered the tests properly.

30

866.  But the many factual disputes on this record require that a jury make the ultimate determination as to whether Wierszewski lawfully arrested Thibault.

## V

Wierszewski is entitled to summary judgment on Thibault's malicious prosecution claim.  In order to prevail on that claim, Thibault would have to prove, among other things, that he suffered a "deprivation of liberty," as understood in Fourth Amendment jurisprudence, apart from the initial seizure. *Sykes v. Anderson*, 625 F.3d 294, 308-10 (6th Cir. 2010).  He has failed to present any evidence of such a deprivation.  In fact, in his response to the Summary Judgment Motion, Thibault argues that "it is clear that [Wierszewski] acted maliciously *by arresting* [Thibault] without any shred of probable cause."  (Thibault Resp. Br. at 9, ECF #15 at 16, Pg. ID 481; emphasis added.)  But, as noted above, to succeed on a malicious prosecution claim, Thibault had to identify evidence that he was deprived of liberty *apart from* his arrest.

At the hearing before the Court, Thibault argued that he was deprived of liberty when he was charged with a crime and forced to hire a lawyer.  He cited no authority for that proposition, and the Court declines accept this unsupported argument.  Thibault also contended at the hearing that he was deprived of liberty by bond conditions imposed upon his initial release from custody.  But he failed to identify any evidence of those conditions in the record.  Finally, Thibault argued at

the hearing that his arrest deprived him of liberty by leading to his suspension from work. Again, however, Thibault has not provided any authority to support his argument that the actions of a private employer may amount to a deprivation of liberty for purposes of a malicious prosecution claim. Therefore, Wierszewski is entitled to summary judgment on Thibault's malicious prosecution claim.[9]

## VI

In the Motion to Exclude, Wierszewski asks the Court to preclude Thibault's proffered expert witness, Marty Bugbee, from testifying at trial. (*See* ECF #13.) As noted above, Thibault intends to offer testimony from Bugbee that Wierszewski erroneously administered the field sobriety tests and wrongly interpreted the results of those tests. Wierszewski argues that the Court should exclude this expert testimony because: (1) Bugbee is "not qualified to render expert testimony in this matter" (*id.* at 12, ECF #13 at 20, Pg. ID 408); and (2) Bugbee's opinions as to whether or not Thibault's performance on the field sobriety tests demonstrated

---

[9] In addition, Wierszewski presented testimony at his deposition that he had "no interaction" and "never spoke with" the prosecutor in charge of Thibault's criminal case. (Wierszewski Dep. at 46, ECF #12-3 at 15, Pg. ID 162.) Thibault has not identified any evidence in the record that contradicts Wierszewski's unrebutted testimony that he did not participate in Thibault's prosecution. This is yet another reason Wierszewski is entitled to summary judgment on Thibault's malicious prosecution claim. *See, e.g.*, *Skousen v. Brighton High School*, 305 F.3d 520, 529 (6th Cir. 2002) (granting state trooper summary judgment on malicious prosecution claim where plaintiff "offered no evidence . . . supporting her claim that [the trooper] caused her to be prosecuted" or that the trooper "had anything to do with [her] prosecution . . . after he submitted his report to the prosecutor's office.").

probable cause for Thibault's arrest are irrelevant and invade the province of the jury. (*See id.* at 3-10, ECF #13 at 11-18, Pg. ID 399-406.)  The Court disagrees.

First, Bugbee is qualified to present the expert testimony described above. Bugbee was a Michigan State Police Trooper for more than twenty years (from 1989 to 2011) and was certified as a "standard sobriety field test expert." (Bugbee Dep. at 5-6, ECF #13-3 at 4, Pg. ID 433.)  In addition, Bugbee "instructed other officers and troopers on field sobriety testing and the arrest process for alcohol enforcement" (*id.* at 6, ECF #13-3 at 4, Pg. ID 433) and was personally involved in stopping motorists and administering field sobriety tests while he worked as a police officer. (*Id.* at 11, ECF #13-3 at 5, Pg. ID 434).  Based on these credentials, Bugbee is qualified to testify as an expert in this action. *See, e.g.*, *United States v. Winkle*, 477 F.3d 407, 415-16 (6th Cir. 2007) (holding that witness was qualified to present expert testimony based his years of work experience, background in the relevant industry, and training).  Wierszewski has not cited any cases in which any court has deemed unqualified a proposed expert on field sobriety tests with Bugbee's background, training, and experience.  Under these circumstances, "[a]ny weaknesses in [Bugbee's] qualifications would [] go to the weight rather than the admissibility of his opinion testimony." *United States v. Nixon*, 694 F.3d 623, 630 (6th Cir. 2012).

Second, Bugbee's testimony as to how field sobriety tests are administered and how officers should interpret a driver's performance on those tests would be helpful to a jury. Members of the jury are unlikely be familiar with the procedures for administering field sobriety tests nor with the standards officers use when determining whether the tests provide "clues" that a driver may be intoxicated. Indeed, Wierszewski, himself, stresses that he was able to detect "clues" of Thibault's intoxication during the field sobriety tests precisely because he had "extensive prior training, experience, and certification as an expert in the administration" of field sobriety tests. (Wierszewski Mot. Summ. J. at 21, ECF #12 at 31, Pg. ID 99.) Thus, it is entirely appropriate for Bugbee to offer expert testimony with respect to the administration of field sobriety tests and how officers "grade" those tests.

While the Court will permit Bugbee to testify with respect to the issues described above, it will not permit him to opine as to whether Wierszewski had probable cause to arrest Thibault. Such testimony would be improper because "the existence of probable cause is a question of law that is not properly the subject of expert testimony." *Rizzo v. Edison, Inc.*, 172 Fed. App'x 391, 394 (2d Cir. 2006); *see also DeMerrell v. City of Cheboygan*, 206 Fed. App'x 418, 427 (6th Cir. 2006) (holding that expert testimony on whether there was probable cause to believe that

34

a suspect posed a significant threat of harm was inadmissible because it "expresses a legal conclusion").

## **CONCLUSION**

For the reasons stated above, **IT IS HEREBY ORDERED** that Wierszewski's Summary Judgment Motion (ECF #12) is **GRANTED IN PART AND DENIED IN PART.** Thibault is entitled to a jury trial on his arrest-without-probable-cause claim; his malicious prosecution claim is **DISMISSED.**

**IT IS FURTHER ORDERED** that the Motion to Exclude (ECF #13) is **DENIED**.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  June 24, 2016


I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 24, 2016, by electronic means and/or ordinary mail.


s/Holly A. Monda
Case Manager
(313) 234-5113