NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0323n.06

No. 16-2021

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jun 09, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ALAN THIBAULT, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| EDWARD WIERSZEWSKI, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE:     DAUGHTREY, SUTTON, and DONALD, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.  Acting in his official capacity as a public safety officer for the City of Grosse Pointe Farms (Michigan), defendant Edward Wierszewski arrested plaintiff Alan Thibault for operating a motor vehicle while under the influence of alcohol or drugs.  When results of breathalyzer and blood tests revealed that Thibault had neither alcohol nor illicit drugs in his system at the time of the arrest, city prosecutors dismissed the charges against Thibault, leading him to file suit against Wierszewski under 42 U.S.C. § 1983 for violating his Fourth and Fourteenth Amendment right to be free from arrest without probable cause.  Wierszewski, raising an affirmative defense of qualified immunity, filed a motion for summary judgment in his favor.  The district court denied that request, in pertinent part ruling that a jury resolving myriad factual disputes in plaintiff Thibault's favor could determine that defendant Wierszewski's conclusion that he had probable

No. 16-2021, *Thibault v. Wierszewski*

cause to make the arrest was not a reasonable one.  Wierszewski now appeals, arguing that Thibault's inability to perform various field sobriety tests properly provided him with the probable cause necessary to justify the arrest.  Given the disputes of fact surrounding the existence of probable cause to arrest, we find ourselves without jurisdiction to hear this appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

At approximately 2:00 a.m. on December 5, 2014, Alan Thibault, driving an 18-wheel, tractor-trailer rig, attempted to make a scheduled delivery of supplies to a Wendy's Restaurant on Mack Avenue in Grosse Pointe Farms, Michigan.  Travelling north on Moross Road, Thibault noticed a break in the median separating the lanes of traffic on Moross, and, mistakenly believing that the break marked the intersection of Moross and Mack, began to execute a left turn with his vehicle.  As he did so, he noticed that Mack Avenue actually was the next intersection up Moross and so attempted to turn the tractor-trailer back onto Moross to travel the rest of the short block.  In doing so, however, the tires on the driver's side of the 48-foot trailer hit the curb on the median in front of him.  Unfortunately for Thibault, as the trailer hit the curb, two public safety officers, Edward Wierszewski and Veronica Cashion, were travelling south on Moross in separate vehicles and observed what appeared to the officers to be reckless driving on the part of the rig's operator.

The two officers pulled behind Thibault, who immediately stopped his truck and activated its hazard lights.  According to Wierszewski, upon parking behind the tractor trailer, he also "observed the trailer did not have a license lamp to illuminate the plate, and a trailer clearance light was not properly working."  Armed with the evidence of those equipment violations, as well as the knowledge that Thibault had driven the rig in such a manner as to allow the trailer to travel onto the curb of the median, Wierszewski activated audio and video recording

devices and approached Thibault to ask him for his license, his medical card, and his log book. When he reached the cab of the truck, the officer noted that Thibault had previously rolled down the window despite the chilly temperatures, that the truck's radio was blaring, that "[t]he driver had an unlit cigarette he was attempting to smoke," that the driver then attempted to extinguish the unlit cigarette, that the driver "appeared disoriented and spoke with slow speech," that the driver's face was "flushed and red," and that after exiting the cab, Thibault was shaking, even though the cab in which he had been sitting was heated.

Wierszewski did not see any alcoholic beverages or containers in the cab and did not detect an odor of alcohol; nevertheless, Wierszewski claimed that his earlier observations led him to conclude that Thibault had been operating the truck while under the influence of either alcohol or drugs. He thus instructed Thibault to perform various field sobriety tests, some of which Thibault performed without difficulty and others of which, according to Wierszewski and other officers who also arrived on the scene, Thibault struggled to complete as instructed.

Believing that the inability of Thibault to perform each of the field sobriety tests perfectly made it more probable than not that he was under the influence of some intoxicating substance, Wierszewski arrested Thibault for a violation of Michigan Compiled Law § 257.625 and directed that he be transported to the Grosse Pointe Farms station house. Once there, officers again subjected Thibault to additional field sobriety tests and to a breathalyzer test. Even though the breathalyzer test resulted in blood-alcohol-content reading of 0.000%, Thibault remained under arrest, and Wierszewski, Cashion, and Sergeant Holly Krizmanich later asserted that they observed a white powder-like substance in the plaintiff's left nostril. However, no attempt was made to obtain a sample of the alleged substance, to document its existence, or to have it tested.

No. 16-2021, *Thibault v. Wierszewski*

More than three hours after Thibault first was taken to the police station, officers transported him to a local hospital where blood was drawn from the plaintiff in an effort to ascertain whether any non-alcoholic intoxicants were present in his bloodstream. Months later, the state police laboratory finally reported that the blood samples were free of any detectable amount of "amphetamines, barbiturates, benzodiazepines, cannabinoids, cocaine metabolites, meprobamate, methadone, opiates, tramadol, zolpidem or any other acidic, neutral or basic drugs." Furthermore, immediately after being released on bail, Thibault contacted his employer and provided a urine specimen for additional testing. Results from that test were received a mere eight hours after the plaintiff's arrest on December 5, 2014, and proved negative for the presence of marijuana, cocaine, amphetamines, opiates, and phencyclidine (PCP).

When all charges against him eventually were dismissed, Thibault filed suit against Wierszewski pursuant to the provisions of 42 U.S.C. § 1983, raising both a claim of malicious prosecution and a claim alleging that Wierszewski had arrested him without probable cause. Following a period of discovery, Wierszewski filed a motion for summary judgment, arguing that the doctrine of qualified immunity protected him from liability in this matter. The district court rejected that argument, however, concluding that "the circumstances surrounding the stop and arrest are riddled with important factual disputes." Furthermore, the district court noted that even the "authenticated video and audio recording of Thibault's detention and arrest" did not necessarily support the conclusion that Wierszewski was objectively reasonable in believing he had probable cause to arrest the plaintiff. According to the court's written ruling, the ambiguous portions of the video, the deposition testimony of Thibault himself, and the deposition testimony of Thibault's expert that some of the field sobriety tests were administered incorrectly "require

that a jury make the ultimate determination as to whether Wierszewski lawfully arrested Thibault."

## DISCUSSION

### Probable-Cause Standard

The legal principle is well established that the Fourth and Fourteenth Amendments to the Constitution of the United States require probable cause to justify an arrest of an individual. *See, e.g.*, *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003). "A police officer has probable cause for arrest if, at the time the officer makes the arrest, 'the facts and circumstances within [the officer's] knowledge and of which [he] had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was committing an offense.'" *Courtright v. City of Battle Creek*, 839 F.3d 513, 521 (6th Cir. 2016) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

### Qualified-Immunity Defense

In the face of Thibault's claim that he was arrested without probable cause, Wierszewski sought to interpose the defense of qualified immunity. The court-created concept of qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Indeed, even in the absence of probable cause to arrest, "an officer is entitled to qualified immunity . . . if he or she could reasonably (even if erroneously) have believed that the arrest was lawful, in light of clearly established law and the information possessed at the time by the arresting agent." *Green v. Throckmorton*, 681 F.3d 853, 865 (6th Cir. 2012) (citation and internal quotation marks omitted).

No. 16-2021, *Thibault v. Wierszewski*

## Jurisdiction to Entertain Appeal

In their appellate briefing, neither Wierszewski nor Thibault questions our authority to entertain this appeal. Nevertheless, we are "under an independent obligation to police [our] own jurisdiction, regardless of whether the parties challenged jurisdiction." *United States v. Certain Land Situated in Detroit*, 361 F.3d 305, 307 (6th Cir. 2004) (internal quotation marks and citation omitted).

Congress has conferred authority upon the courts of appeals to review "*final decisions* of the district courts." 28 U.S.C. § 1291 (emphasis added). Thus, as a general matter, a party may not appeal from a denial of a request for summary judgment, simply because such a denial is not a final order. *Black v. Dixie Consumer Prods. LLC*, 835 F.3d 579, 582 (6th Cir. 2016). Nevertheless, § 1291's jurisdictional grant has been construed to include authority to review collateral orders that "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). As this court has recognized:

> An order denying qualified immunity is a collateral order because it is conclusive, separable from the merits of the action and, as the purpose of qualified immunity is to provide officers with "*immunity from suit* rather than a mere defense to liability," is effectively unreviewable on appeal from a final judgment.

*Brown v. Chapman*, 814 F.3d 436, 443-44 (6th Cir. 2016) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526-29 (1985)).

Even though it might appear that we therefore have jurisdiction over Wierszewski's appeal of the denial of his request for summary judgment based upon his claim of qualified immunity, the Supreme Court has made clear that our authority to review a district court's denial of qualified immunity extends only to those appeals that turn "on an issue of law." *Mitchell*,

No. 16-2021, *Thibault v. Wierszewski*

472 U.S. at 530. Indeed, "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." *Johnson v. Jones*, 515 U.S. 304, 319-20 (1995). We explained in *Thompson v. City of Lebanon*, 831 F.3d 366, 370 (6th Cir. 2016):

> We may decide an appeal challenging the district court's *legal* determination that the defendant's actions violated a constitutional right or that the right was clearly established. We may also decide an appeal challenging a *legal* aspect of the district court's factual determinations, such as whether the district court properly assessed the incontrovertible record evidence. And we may decide, as a *legal* question, an appeal challenging the district court's factual determination insofar as the challenge contests that determination as blatantly contradicted by the record, so that no reasonable jury could believe it.
>
> We may not, however, decide an appeal challenging the district court's determination of evidence sufficiency, *i.e.*, which facts a party may, or may not, be able to prove at trial. Because such a challenge is purely fact-based, it does not present a legal question in the sense in which the term was used in *Mitchell*, and is therefore not an appealable final decision within the meaning of 28 U.S.C. § 1291. . . . We have also explained that the defendant-appellant may not challenge the inferences the district court draws from those facts, as that too is a prohibited fact-based appeal.

(Citations and internal quotation marks omitted.)

In this case, the district court concluded that the evidence before it was such that the legitimacy of the justification to arrest Thibault for driving under the influence of an intoxicant rested upon which version of contested facts a jury would credit. As the district court stated, "(1) there are important factual disputes concerning the basis for the arrest and (2) if a jury resolved those disputes in Thibault's favor, it could find that Wierszewski lacked a reasonable basis to believe that the arrest was lawful." Thus, unless Wierszewski can establish that there is no such material dispute of fact, this court is without jurisdiction over this matter at this time.

No. 16-2021, *Thibault v. Wierszewski*

Wierszewski argues that the district court erred in denying him the protections of qualified immunity. In doing so, he concedes that "[i]n general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995). However, he also notes that only a fair probability of criminal activity is required to satisfy the Constitution's probable-cause requirement, *Kinlin v. Kline*, 749 F.3d 573, 578 (6th Cir. 2014), and that an ultimate dismissal of charges brought by an officer does not mean, in all cases, that probable cause for an arrest did not exist. *Id.* He points to certain of his personal observations of Thibault, to results of field sobriety tests, and to video of activities occurring shortly after the stop of Thibault's truck and contends that those purportedly undisputed bits of evidence support his conclusion that he had probable cause to arrest Thibault. However, an examination of the record on appeal reveals exactly the type of factual disputes that should be resolved by a jury in the first instance.

**Wierszewski's Personal Observations of Thibault's Person and Demeanor**

What clearly is *not* in dispute in this case is the legitimacy of the initial stop by Wierszewski of Thibault's truck. Even Thibault admits that the trailer portion of his rig hit the curb of a median on Moross Road. However, following that stop, Wierszewski claimed to have observed certain actions and conditions that led him to decide that Thibault should be arrested for driving under the influence of an intoxicant. Specifically, as noted previously, the officer reported that the window on the driver's side of Thibault's cab was rolled down despite the chilly weather, that the radio in the truck was unusually loud, that Thibault was attempting to smoke an unlit cigarette, that Thibault then attempted to extinguish the cigarette that was unlit, that Thibault's face was red and flushed, that the driver appeared disoriented, and that Thibault began shaking upon exiting his vehicle.

Such observations could, in certain circumstances, be indicative of an intoxicated condition. On an attempted interlocutory appeal from a denial of qualified immunity, however, "the defendant must be prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998). In that posture, it is clear that any *undisputed* observations by Wierszewski cannot alone justify the subsequent arrest of Thibault. The plaintiff concedes that he had rolled down the window of his cab prior to the moment of the traffic stop, although he later explained during his deposition testimony that he had rolled the window down when he "made the stop to make the first initial left turn." Clearly, Wierszewski was not in possession of such knowledge during his initial confrontation with Thibault, but he also never questioned Thibault about the reason for having the window down, and, clearly, simply travelling in a vehicle with a rolled-down window, even on a chilly night, is not an indication that the driver is intoxicated. Furthermore, Thibault maintained that his radio was "[n]ot that loud," especially considering that the volume had to be raised in order to drown out the noise of the truck's engine.

Thibault also denied that he was attempting to smoke an unlit cigarette when he was stopped, or that he attempted to extinguish any such unlit cigarette. Instead, he told Wierszewski that the cigarette "goes out a lot," explaining why it was not lit at that time, and later offered a sworn affidavit stating that "[a]t no point during [the] December 5, 2014[,] encounter with Officer Edward Wierszewski did [he] attempt to extinguish an unlit cigarette." Additionally, the video of the traffic stop never shows Thibault attempting to extinguish any cigarette, lit or unlit.

Furthermore, Wierszewski himself, during his deposition, undercut the validity of his reliance on the "flushed, red" appearance of Thibault's face as a sign of possible intoxication

when, under questioning from Thibault's counsel, Wierszewski admitted that "it was cold, very cold" that night and that low temperatures could explain the plaintiff's flushed, red face. Similarly, the cold night could explain why Thibault, who was not wearing a sweater or jacket at the time, was shaking after being ordered out of the cab of his truck. Indeed, when Wierszewski asked Thibault why he was shaking so much, the plaintiff responded, "Because it's chilly." The video of the occurrences that took place after the stop confirm Thibault's explanation as the other officers on the scene were clad in heavy police jackets, and some of those officers also were wearing winter stocking caps on their heads.

Finally, the video of the encounter clearly discredits Wierszewski's assertion that Thibault appeared disoriented at the time of the arrest. Indeed, the defendant's own recording of the events shows that Thibault walked steadily from his truck to the area where the field sobriety tests were conducted, even though he was forced to traverse what appeared to be a sloped, grassy median. In fact, the video shows that Thibault walked as steadily and as rapidly over that distance as Wierszewski did. Moreover, at all times, Thibault's speech was clear and coherent, and he was able to understand all directions given him by Wierszewski. In short, none of the personal observations catalogued by Wierszewski can be considered undisputed evidence that Thibault was impaired in any way whatsoever.

**Performance of Field Sobriety Tests**

Wierszewski nevertheless rests his heaviest support for his decision to arrest the plaintiff on his assertion that Thibault failed to perform the field sobriety tests properly. In doing so, he cites in his appellate brief 17 decisions from various federal courts, all allegedly standing for the proposition that failure to perform field sobriety tests satisfactorily "constitutes reliable evidence upon which officers may premise probable cause determinations." What Wierszewski fails to

No. 16-2021, *Thibault v. Wierszewski*

mention, however, is the salient fact that, in 16 of the 17 cited cases, additional evidence existed to bolster the presumption that less-than-satisfactory performance on field sobriety tests indeed was indicative of intoxication or impairment. *See Bradley v. Reno*, 632 F. App'x 807, 808-09 (6th Cir. 2015) (plaintiff's breath smelled of alcohol, his eyes were red and glassy, his speech was slurred, he admitted drinking a "couple" "small pitchers" of beer and a "couple" bottles of beer in the preceding two hours, and a breathalyzer test indicated a blood-alcohol level of .111%); *Jolley v. Harvell*, 254 F. App'x 483, 485 (6th Cir. 2007) (officer reported odor of marijuana in car and noted plaintiff's bloodshot eyes); *Wynn v. Morgan*, 861 F. Supp. 622, 626 (E.D. Tenn. 1994) (unusual behavior included plaintiff accelerating away from arresting officer after being stopped; after being stopped again, plaintiff screamed at officer and ran away from him as he attempted to handcuff her); *Burgett v. Sanborn*, No. 6:13-CV-1358-TC, 2015 WL 4644619, at *2 (D. Or. May 14, 2015) (officer noticed an odor of alcohol, and plaintiff admitted drinking a glass of whiskey and two glasses of wine a few hours earlier), *report and recommendation adopted by* 2015 WL 4644598 (D. Or. Aug. 4, 2015); *Ketchum v. Khan*, No. 10-14749, 2014 WL 3563437, at *1 (E.D. Mich. July 18, 2014) (officer smelled strong odor of intoxicants, and plaintiff admitted to consuming beer and ingesting Lorazepam); *Cameron v. City of Riverview*, No. 10-14098, 2011 WL 3511497, at *2 (E.D. Mich. July 26, 2011) (odor of intoxicants, plaintiff's speech was slurred, and plaintiff "admitted to consuming a couple of alcoholic beverages"), *report and recommendation adopted by*, 2011 WL 3511485 (E.D. Mich. Aug. 11, 2011); *Mott v. Davis*, No. 3:10-CV-270, 2011 WL 4729856, at *1 (E.D. Tenn. Oct. 5, 2011) (plaintiff's speech was slurred, one eye was bloodshot, and both eyes were "watery and glazed over"); *Freeland v. Simmons*, No. 4:09cv01384-WOB, 2012 WL 258105, at *2 (D. S.C. Jan. 27, 2012) (plaintiff seen at two bars, admitted that he had "had a few," officer detected a

No. 16-2021, *Thibault v. Wierszewski*

strong odor of alcohol and noted that plaintiff's eyes were red, glassy, and bloodshot); *Rutherford v. Cannon*, No. 8:09-2137-HMH-BHH, 2010 WL 3905386, at *2 (D. S.C. Sept. 2, 2010) (officer detected odor of alcohol and plaintiff admitted he had been drinking beer), *report and recommendation adopted by* 2010 WL 3834448 (D. S.C. Sept. 27, 2010); *Shackleford v. Gutermuth*, No. Civ.A. 301CV743S, 2005 WL 3050522, at *1 (W.D. Ky. Nov. 10, 2005) (plaintiff's eyes were dilated and not reactive to light); *Briggs v. Holsapple*, No. 08-6037-KI, 2009 WL 395134, at *1 (D. Or. Feb. 11, 2009) (officer smelled alcohol, plaintiff's eyes were watery and bloodshot, and plaintiff admitted he "had a couple of beers" earlier); *Wilson v. City of Coeur d'Alene*, No. 2:09-CV-00381-EJL, 2010 WL 4853341, at *1 (D. Idaho Nov. 19, 2010) (plaintiff stated he had come from a bar and had drunk "some beer," plaintiff's face was "very flushed and his eyes were red and glassy"); *Corcoran v. Higgins*, No. 08 Civ. 10734 (HB), 2010 WL 1957231, at *1 (S.D. N.Y. May 13, 2010) (plaintiff had glassy eyes, slurred speech, and impaired motor coordination); *People v. Cloutier*, No. 328255, 2016 WL 4947801, at *1 (Mich. Ct. App. Sept. 15, 2016) (officer smelled "heavy odor of intoxicants," defendant admitted drinking and had glassy, bloodshot eyes and slurred speech); *United States v. Gorder*, 726 F. Supp.2d 1307, 1309 (D. Utah 2010) (officer "noticed an alcoholic beverage odor," defendant had bloodshot eyes and slurred speech, and a "heavily intoxicated" passenger was in the vehicle); *United States v. Hernandez-Gomez*, No. 2:07-CR-0277-RLH-GWR, 2008 WL 1837255, at *2 (D. Nev. Apr. 22, 2008) (adopting in full the findings and recommendations of the magistrate judge that the arresting officer noticed the odor of alcohol, defendant's eyes were bloodshot, and defendant admitted to drinking "two or three beers").

The seventeenth cited case, *People v. Berger*, 551 N.W.2d 421 (Mich. Ct. App. 1996), does not indicate specifically that the arresting officer relied on other observations other than the

field sobriety tests themselves in concluding that he possessed probable cause to arrest the defendant. The *Berger*, decision, however, held only that the horizontal-gaze-nystagmus (HGN) test used by police officers as one tool to determine the intoxication of a motorist is admissible as evidence if the test is performed properly by an officer who is qualified to administer it. *Id.* at 423-24.

In any event, it is clear that a defendant like Wierszewski, who is seeking to rely upon the results of field sobriety tests to establish probable cause for an arrest, must establish that the tests were administered properly and that the results of the tests clearly demonstrate the arrestee's intoxication or impairment. When, as in this case, the issue arises in the context of a defense motion for summary judgment, we must view that evidence in the light most favorable to the plaintiff, *see Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014), and determine whether countervailing evidence casts doubt on the arresting officer's determination. However, if one version of the relevant facts "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). This result is especially true when a video, not alleged to have been altered in any way, depicts the actions at issue. *Id.* at 380-81.

Without question, the existence of probable cause to arrest an individual must be assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 302 (6th Cir. 2005) (quoting *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001)). Moreover, reviewing courts must acknowledge "the difficulty inherent in making on-the-fly determinations regarding possible driving impairments" [and must] "recognize the severity of drunk driving and 'the potential

consequences of an incorrect call.'" *Green*, 681 F.3d at 866 (citation omitted). "Yet officers do not have free rein to administer field sobriety tests to whomever they please and then to arrest that person for making the slightest misstep while performing the tests." *Id.* at 866-67.

Prior to placing Thibault under arrest and transporting him to the Grosse Pointe Farms station house, Wierszewski forced the plaintiff to undergo eight field sobriety tests. Keeping in mind the principles set forth in *Green*, we examine those tests captured by Wierszewski's own video camera and microphone to determine whether there exists a sufficient factual dispute over the legitimacy of the criteria upon which the arresting officer relied so as to justify submitting the matter to a jury for resolution.

### 1. Pick-a-Number Test

In the first field sobriety test given to Thibault, Wierszewski explained, "I'm going to give you a set of numbers. I want you to pick any number that falls between the set I give you. All right. Pick a number for me between – pick any number between 21 and 19." In a clear voice, Thibault answered, "20." Clearly, nothing about the plaintiff's performance on the first field sobriety test justified Wierszewski concluding that he possessed probable cause to arrest Thibault.

### 2. Alphabet Test

For the second test, Wierszewski asked Thibault to "recite the alphabet starting with the letter D, David, stopping at the letter O, as in ocean." Again, clearly and without hesitation, the plaintiff responded, "D. A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, U, V -- stopping at O." The plaintiff's expert, Marty Bugbee, who served for 22 years as a Michigan State Police trooper and who "instructed other officers and troopers on field sobriety testing and the arrest process for alcohol enforcement," testified that, although Thibault technically did the

No. 16-2021, *Thibault v. Wierszewski*

test improperly, the results should not be interpreted as failing that particular task. According to Bugbee:

> [O]ther observations . . . need to be taken into account. . . . [H]e did [the test] with clear speech. He wasn't confused. Although he did it wrong, he wasn't necessarily confused. The letters were said in sequence or the letters were said in sequence. He maintained a steady position of balance throughout the test. I interpreted as though he was confused of what he was asked because it was never said, quote, without saying any other letters. He just said: Go from D to O. He didn't say: Don't say any other letters.

Thus, in regard to this second test, Thibault has created at least a genuine dispute concerning the plaintiff's proficiency in completing the task.

### 3. Fingertip-Dexterity Test

Next, Wierszewski directed Thibault, "With your right hand, when I ask you to, you're going to touch the tip of your thumb to the tip of each finger and count out loud, just like this. 1, 2, 3, 4; 4, 3, 2, 1. You do that three times." Thibault completed that third test perfectly. Again, nothing in the plaintiff's performance of the fingertip-dexterity test justified Wierszewski in finding probable cause to arrest Thibault for being intoxicated.

### 4. First Walk-and-Turn Test

Wierszewski then directed Thibault to execute a walk-and-turn test, which "requires the subject to walk heel to toe along a straight line for nine paces, pivot, and then walk back heel to toe along the line for another nine paces." *Pennsylvania v. Muniz*, 496 U.S. 582, 585 n.1 (1990). In addition, Wierszewski required Thibault to place his right foot in front of his left foot and stand in that heel-to-toe position while the officer explained and "demonstrated" the proper way to complete the exercise.[1] The video of the stop indicates that Thibault was forced to remain in

---

[1] Wierszewski testified in his deposition that he himself "performed this test" as an example for Thibault. However, the video shows that the officer did not stand in the heel-to-toe position for any significant period of time whatsoever before starting the test, much less for more than a minute while under suspicion of committing a serious

No. 16-2021, *Thibault v. Wierszewski*

that unnatural posture for 62 seconds before beginning the test. Despite that fact, despite still being outside in the December chill without a jacket or sweater, and despite having informed Wierszewski that he had "a balance issue,"[2] Thibault was able to maintain his balance for the duration of the instruction period.

Furthermore, at three points while giving his instructions, Wierszewski directed Thibault to walk *eight* paces. Only later did the officer correct himself and explain that Thibault was to count *nine* paces forward and then back. Unquestionably, the video shows that Thibault was able to follow those varying instructions and complete the test, even though he did use his arms to balance himself on occasion and even though the flashing emergency lights on Wierszewski's squad car were reflecting off the back of Thibault's tractor-trailer as the plaintiff performed the exercise. Moreover, Wierszewski's deposition testimony that Thibault "stopped the test while he was performing it" is contradicted by the video recording, which indicates no such hesitation.

Bugbee also offered his opinion that Thibault's performance on the first walk-and-turn test would not justify a conclusion that probable cause existed to believe the plaintiff was impaired. According to Bugbee:

> [D]uring the instruction phase Mr. Thibault was very steady. He maintained the position that the officer asked him to while he was giving instructions. Okay. As he performed the test, though he did use his arm to balance, it didn't appear as though he stepped off the [imaginary] line.
>
> He did the proper amount of steps, which indicated that he had understood the questions, recalled them correctly and executed it properly. He did a good turn

---

traffic violation and without wearing an outer garment on a cold, December morning. Furthermore, Wierszewski did not complete the required nine paces before executing the pivot turn; instead his "performance" of the test involved walking three steps, stopping, giving further instructions, resetting himself, walking four more steps, pivoting, and walking only four more steps.

[2] Wierszewski denies that Thibault referenced any problems maintaining his balance. The fact that the plaintiff nevertheless insists that he did creates yet another genuine dispute of fact that this court is not in a position to resolve. Nor does the video or the transcript of the encounter clear up the disagreement. Although nowhere in the transcript of the field sobriety tests does Thibault's reference to balance problems appear, a number of inaudible comments are made throughout the video and could support the plaintiff's version of the events of the early morning hours of December 5, 2014.

No. 16-2021, *Thibault v. Wierszewski*

without losing control there and walked back. So in all, the only thing I saw him do which may raise some suspicion was he raised his arms above six inches to maintain his balance.

Bugbee did concede that the walk-and-turn test ultimately was administered properly by Wierszewski. Nevertheless, the district court correctly concluded that a genuine dispute of fact exists regarding the propriety of relying on Wierszewski's interpretation of Thibault's performance on the first walk-and-turn test to establish probable cause to arrest the plaintiff for driving under the influence of an intoxicant. Calling into question the validity of Wierszewski's claim that Thibault "failed" the first walk-and-turn test were the facts that: (1) Wierszewski testified falsely that Thibault stopped the test; (2) Wierszewski's assertions that Thibault could not "even stand there" and could "barely do the walk and turn" were contradicted by the video evidence; (3) Wierszewski gave confusing, and somewhat contradictory, instructions on how to complete the test; and (4) Bugbee testified that Thibault actually did perform the first test satisfactorily.

### 5. One-Leg-Stand Test

Wierszewski next directed Thibault to perform a one-leg-stand test, in which a person is required "to stand on one leg with the other leg extended in the air for 30 seconds, while counting aloud from 1 to 30." *Muniz*, 496 U.S. at 585 n.1. Wierszewski claims that Thibault also exhibited "clues" of intoxication during that field sobriety test because the plaintiff "failed to count by 'one thousand one, one thousand two, one thousand three,' etc. Mr. Thibault could not maintain his elevated foot at a constant height, swayed while balancing, and used his arms to balance. He also hopped at [sic] one occasion."

Again, the video and Bugbee's expert testimony cast serious doubt on the validity of Wierszewski's conclusion that Thibault failed this field sobriety test. Although it is true that

-17-

No. 16-2021, *Thibault v. Wierszewski*

Thibault did not count "one thousand one, one thousand two, one thousand three, etc.," during the test, the plaintiff, prior to performing the test, stood erect without swaying at all, and during the test, held his leg out while counting from 1 to 35. Moreover, rather than allowing Thibault to keep his extended leg six inches off the ground as originally directed, Wierszewski twice directed the plaintiff to raise his leg even higher, until at one point, Thibault's left leg was extended from his body at approximately a 45-degree angle. When evaluating the video of the one-leg-stand test, Bugbee concluded that Thibault indeed performed that field sobriety test satisfactorily: "He had slight raising of the arms for balance. Proper count. And the tempo was good. There was no slurred speech as he was speaking and counting out. He had no loss of balance. He was able to complete the test without putting his foot to the ground."

### 6. Modified Romberg Test

In the next field sobriety test, Wierszewski asked Thibault to close his eyes, tilt his head backward, and when he felt that 30 seconds had passed, bring his head forward and open his eyes. While performing that test, Thibault stood erect and still and neither swayed nor indicated any difficulty in maintaining his balance. Only 20 seconds after the start of the test, Thibault indicated that he believed that 30 seconds had elapsed. However, Thibault indicated that between 29 and 31 seconds had gone by because he had counted in his head "[j]ust one, two, three, four," not "by thousands." Nevertheless, even though Wierszewski subsequently informed Cashion that Thibault's "30-second passage was 20 seconds," under the circumstances, the mere ten-second discrepancy did not provide the officer the probable cause necessary to justify placing Thibault under arrest.

No. 16-2021, *Thibault v. Wierszewski*

### 7. Horizontal-Gaze-Nystagmus Test (HGN Test)

The penultimate test Wierszewski had Thibault perform was the HGN test. As explained by the Supreme Court:

> The "horizontal gaze nystagmus" test measures the extent to which a person's eyes jerk as they follow an object moving from one side of the person's field of vision to the other. The test is premised on the understanding that, whereas everyone's eyes exhibit some jerking while turning to the side, when the subject is intoxicated "the onset of the jerking occurs after fewer degrees of turning, and the jerking at more extreme angles becomes more distinct."

*Muniz*, 496 U.S. at 585 n.1 (citation omitted).

Because Thibault was asked to stand with his back to the camera mounted on the dashboard of Wierszewski's squad car during the HGN test, the video offers the viewer no indication of the results of the test.[3] Wierszewski testified, however, that Thibault "had lack of smooth pursuit in both eyes and distinct nystagmus at maximum deviation of both eyes."

Rather than accept blindly Wierszewski's interpretations of the HGN test results, Bugbee raised concerns with Wierszewski's administration of that test. In his deposition testimony, the plaintiff's expert explained that "[i]t appeared that the HGN test, the horizontal gaze nystagmus, was conducted in conjunction with the lack of convergence test, which are two different tests. They were both mixed into one test."

Even after conducting the seven field sobriety tests, Wierszewski apparently still was not convinced that he possessed the probable cause required to arrest Thibault for driving under the influence of an intoxicant. Therefore, he asked the plaintiff for permission to search the cab of the tractor-trailer, and after receiving that permission, placed Thibault in the squad car and enlisted Cashion to assist him in the search. During that attempt to uncover incriminating

---

[3] As part of the administration of the HGN test, Thibault was asked to follow the beam from Wierszewski's penlight. At the same time, however, Thibault also was facing streetlights on Moross Road, was facing the back of his tractor-trailer with its blinking hazard lights, and had Officer Cashion walk into his field of vision.

No. 16-2021, *Thibault v. Wierszewski*

evidence, Wierszewski spent almost seven minutes in the cab, and Cashion searched for almost an additional minute after that. Even so, the officers were unable to uncover any evidence to establish probable cause to arrest Thibault, leading a clearly frustrated Wierszewski to make the following statements during his fruitless search:

> I'm just wondering where it's at here. . . . He didn't have enough time to hide anything. It's got to be something in here. Nothing.

> Come on. Find me something here. Come on. There's got to be something.

> What is he on[?] I'm not happy. I want something. There's got to be something here that I'm missing. This shit again.

> What am I missing[?] The one thing I didn't do, I didn't look up his nose to see if he snorted anything. Some stimulant. Got to be cuz everything sped up.

> Oh, God, something is in here. I know it is.

### 8. Second Walk-and-Turn Test

Unable to discover physical evidence in the tractor-trailer that would provide probable cause to arrest Thibault for driving under the influence, Wierszewski brought the plaintiff back out from the squad car, checked the plaintiff's eyes a second time, and questioned him again about any alcohol or drug use, going so far as to examine Thibault's hands and arms for needle marks. Finally, Wierszewski ordered Thibault to perform a second walk-and-turn test, first directing the plaintiff to stand with his right heel in front of his left toes for 45 seconds. Again, Thibault was able to maintain his balance during the instructional phase of the test, but clearly began to lose his balance as he started to walk with heel-to-toe steps. Before Thibault could take even the first nine steps, however, Wierszewski arrested him "for operating while intoxicated." Interestingly, Wierszewski then stated, "You can't even walk," but Thibault exhibited no difficulty in walking back to the squad car, even though his arms were cuffed behind his back at

No. 16-2021, *Thibault v. Wierszewski*

that time.  Furthermore, Thibault continued to converse intelligibly and appropriately, both at the scene and later at the station house.

After viewing both the video of the stop and the field sobriety tests and the video of Thibault's interactions with law enforcement personnel at the station house, Bugbee testified during his deposition that "the amount of tests given and the repetitive tests was very excessive," so much so that Bugbee "was flabbergasted by how much [Wierszewski] was putting this person through to try to get a positive result."  The plaintiff's expert continued, "So I think it was rather excessive and I think that Officer Wierszewski ignored the evidence that he collected all along the way to make his decision.  It just appeared to be a results based investigation."  Similarly, Thibault offered his opinion that Wierszewski was intent on arresting him regardless of the evidence of the plaintiff's innocence.  For example, after Thibault voiced concern about how inconsequential the blood-test results would be if, as claimed by Wierszewski, those results would not be available for two or three months, Wierszewski responded, "It doesn't matter what the blood tests says.  We'll go off my report."

Before this court, Wierszewski attempts to counteract those accusations and seeks to justify his decision to administer field sobriety tests by referencing his initial observations of Thibault.  He then claims that, after the completion of those tests, he possessed probable cause to arrest Thibault for driving under the influence based upon his interpretation of the results of the tests he directed the plaintiff to perform.  Unfortunately for Wierszewski, the video of the traffic stop and the field sobriety tests, Thibault's testimony, and the testimony of Thibault's expert create genuine disputes of material fact that call into question both the validity of Wierszewski's conclusions, his credibility, and the legitimacy of his decision to arrest Thibault.

No. 16-2021, *Thibault v. Wierszewski*

Because this case has come before us in the posture of an appeal from the denial of summary judgment, we may exercise jurisdiction over the matter only to the extent that Wierszewski is willing to accept the plaintiff's view of any disputed facts and those facts established by uncontroverted video evidence. Viewed in that light, the following facts were available to inform Wierszewski's decisions:

-- some of the tires of Thibault's tractor-trailer came into contact with the curb of a median on Moross Street;

-- the driver's side window of Thibault's vehicle had been rolled down;

-- the truck's radio was playing loudly enough to be heard over engine noise but was not unduly loud;

-- Wierszewski neither saw nor smelled any evidence of any intoxicant in Thibault's vehicle or on the plaintiff's person;

-- Thibault denied that he had consumed any alcoholic beverages or ingested any drugs in the hours prior to beginning his route;

-- Thibault knowingly had an unlit cigarette in his mouth at the time of the traffic stop;

-- Thibault did not attempt to extinguish the unlit cigarette;

-- the night was chilly, causing Thibault to shiver upon exiting his vehicle and resulting in a red, flushed appearance;

-- Thibault spoke in a somewhat slow, yet normal and coherent fashion;

-- upon exiting his truck, Thibault did not appear disoriented and was not unsteady in his gait;

-- Thibault performed the pick-a-number and the fingertip-dexterity tests perfectly;

-- Wierszewski either did not give clear instructions for or did not administer properly the alphabet test, the first walk-and-turn test, the one-leg-stand test, the Modified Romberg test, and the HGN test;

-- Thibault performed satisfactorily on the alphabet test, the Modified Romberg test, the walk-and-turn test, and the one-leg-stand test; and

-- momentary losses of balance while performing the walk-and-turn tests and the one-leg-stand test can be explained by the plaintiff's problems with balancing that were mentioned to Wierszewski prior to the performance of those tests.

Clearly, it was not illegal for Thibault to operate a tractor-trailer with the window down while listening to the radio and holding an unlit cigarette in his mouth. Thus, a reasonable jury could determine that Wierszewski was not justified in forcing the plaintiff to perform numerous field sobriety tests simply because of the relatively minor traffic violation committed on a nearly empty street at 2:00 in the morning. Even after the tests were administered, a jury could conclude, after watching the video and hearing the testimony of the plaintiff and the plaintiff's expert, that the tests were not administered properly and that Thibault nevertheless completed the tests satisfactorily.

It is true that no video evidence or deposition testimony specifically contradicts Wierszewski's explanation of Thibault's performance on the HGN test. However, as we held in *Green*, "What matters here [is] that a subsequent test for drugs and alcohol showed that the driver was in fact sober. That evidence alone is sufficient to cast doubt on the truthfulness of [the arresting officer's] testimony regarding [the plaintiff's] pupils." *Green*, 681 F.3d at 863.

In short, viewing the evidence in the record in the light most favorable to the plaintiff—as we must—it becomes clear that the facts underlying Wierszewski's determination that he had probable cause to arrest Thibault are in dispute. Moreover, those disputes are neither minor nor immaterial. Consequently, the district court properly denied summary judgment to Wierszewski on his asserted claim of qualified immunity.

## CONCLUSION

Supreme Court and Sixth Circuit precedents dictate that when a district court denies summary judgment because of the existence of genuine factual disputes, we have no jurisdiction

-23-

No. 16-2021, *Thibault v. Wierszewski*

over an appeal of that denial. In this case, the district court identified just such factual disputes regarding the reasonableness of Wierszewski's determination that probable cause to arrest Thibault existed. Because the record before us supports the district court's conclusion, we must DISMISS this appeal for lack of jurisdiction and REMAND the matter to the district court for further proceedings.

No. 16-2021, *Thibault v. Wierszewski*

SUTTON, Circuit Judge, dissenting.   As I read *Johnson*, as our court's cases read *Johnson*, and as the Supreme Court itself has read *Johnson*, it deprives us of jurisdiction over an appeal from denial of qualified immunity only when the defendant's argument boils down to an attack on the plaintiff's evidence-supported version of the facts.  *See Leary v. Livingston Cty.*, 528 F.3d 438, 441 (6th Cir. 2008).  But when a defendant challenges the reasonableness of *inferences* the district court drew from the plaintiff's account of the facts, we must hear the appeal.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007).  That's especially true when an inference implicates a mixed question of law and fact, as it typically will in a qualified immunity case.

Today's case illustrates the problems with a broad reading of *Johnson*.  Like the defendant in *Scott*, Wierszewski argues that the district court drew an untenable inference from the video evidence:  that Thibault's performance on the sobriety tests showed he was not driving while intoxicated.  According to Wierszewski, that untenable inference gave rise to an untenable legal conclusion:   that Wierszewski was not entitled to qualified immunity because he unreasonably concluded he had probable cause to arrest Thibault.  On Wierszewski's view, the undisputed facts in the case—most notably, Thibault's difficulty maintaining his balance during several of the tests—establish that he had a reasonable basis for the arrest even if we resolve all other factual disputes in Thibault's favor.  The Supreme Court recently made clear that deciding legal claims of this sort is "a core responsibility of appellate courts" that *Johnson* does not limit.  *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2019 (2014).  Yet today the court finds itself without jurisdiction, and thereby strips Wierszewski of immunity from suit (and his right to an interlocutory appeal, *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985)) without considering his legal argument on the merits.

-25-

No. 16-2021, *Thibault v. Wierszewski*

For these reasons, I respectfully dissent.

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: June 09, 2017

Mr. George M. DeGrood III
Mr. Solomon M. Radner
Ms. Michelle A Thomas
Mr. Daniel Weininger

Re:  Case No. 16-2021, *Alan Thibault v. Edward Wierszewski*
Originating Case No. : 2:15-cv-11358

Dear Counsel,

The Court issued the enclosed Opinion today in this case.

Sincerely yours,

s/Beverly L. Harris
Case Manager
Direct Dial No. 513-564-7077

cc:  Mr. David J. Weaver

Enclosure

Mandate to issue